James DORSEY, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

Nos. 546, 1998.

Supreme Court of Delaware.

Submitted: April 18, 2000.
Decided: Oct. 18, 2000.

Stephen B. Potter, Jennifer–Kate Aaronson, Potter, Carmine & Leonard, P.A., Wilmington, Delaware, Adam Balick, Balick & Balick, Wilmington, Delaware, for appellant.

Peggy J. Hageman, Cynthia R. Kelsey, Department of Justice, Wilmington, Delaware, for appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, HARTNETT[1], and BERGER, Justices (constituting the Court en Banc).

HOLLAND, Justice, for the majority.

The defendant-appellant, James Dorsey, was charged with Murder in the First Degree, Possession of a Firearm During the Commission of a Felony and Possession of a Firearm by a Person Prohibited. Following a jury trial in the Superior Court, Dorsey was convicted on all charges. Dorsey filed a Motion for a New Trial on the grounds of prosecutorial misconduct and inadmissible evidence. The Superior Court granted Dorsey's motion with respect to two convictions: Murder in the First Degree and Possession of a Firearm During Commission of a Felony.

This is Dorsey's direct appeal from the final judgment of conviction on the charge of Possession of a Firearm by a Person Prohibited. Dorsey contends that the Superior Court erroneously denied his Motion to Suppress the State's use of the firearms as evidence. According to Dorsey, the warrant that authorized a search of his automobiles for those weapons was not supported by probable cause in violation of his rights under the Delaware Constitution and applicable statutes.

This Court has concluded that the warrant to search Dorsey's automobiles was issued without a demonstration of probable cause. The protection against unreasonable searches that is afforded to all persons by the Delaware Constitution requires the suppression of illegally seized items as evidence. Accordingly, Dorsey's conviction for Possession of a Firearm by a Person Prohibited must be reversed.

### Facts

On August 14, 1996, at 4:05 p.m., Dorsey called 911 to request police and ambulance assistance at 615 W. 5th Street, Wilmington. City of Wilmington police officers responded and found the body of Frank Williams in an upstairs bedroom. It appeared that Williams had suffered a single gun shot wound to the head. Police searched the immediate area but failed to

1. Retired Justice sitting by designation pursuant to Delaware Constitution art. IV, § 38.

locate a gun. Police then interviewed Dorsey, who indicated that he owned the building and rented a room to Williams. The building also housed four or five other tenants.

Later that same day, police applied for and received a search warrant for the premises known as 615 W. 5th Street. The application for that search warrant indicated that the items the police wanted to search for were "an unknown caliber handgun and ammunition" and "any clothing or items that appeared to have the presence of blood." The warrant also indicated the police would be "processing . . . the house for physical evidence, to include but not limited to: videotaping, photo's [sic], latent prints, and any other evidence which may assist in the investigation of the death of Frankie Williams." The police executed the search warrant for the premises at approximately 6:00 p.m. That search warrant is not an issue in this appeal.

While still executing the search warrant for the premises described as 615 W. 5th Street, the police applied for and obtained a second warrant to search two automobiles, a 1986 Dodge 600 and a 1989 Cadillac DeVille. The two automobiles were owned by and registered to Dorsey. That search warrant is the subject matter of this appeal.

In the affidavit for the warrant to search Dorsey's vehicles, the police alleged the following facts in support of probable cause:

1. On 14 Aug 96 at 1604 hours the Wilmington Police were summoned to a shooting scene at 615 W. 5th Street, Wilmington, DE. This incident is documented under Wilmington Police Case # 96-19754.

2. Upon arrival officers were approached by a subject who identified himself as the owner of the property, James Dorsey. Dorsey related that this afternoon he had returned from an out of state trip. He related that he houses multiple people in his property as borders [sic]. Upon checking the residence he related that he found one of the borders [sic] prone in his room bleeding from head.

3. Police checked the crime scene and it appeared the victim, tentatively ID'd as Frankie Williams, suffered a single gun shot wound to the head, killing him.

4. A check of the immediate crime scene did not locate the weapon, believed to be an unknown caliber handgun.

5. Police are still attempting to identify and interview all present tenants of the residence which according to the landlord houses 4–5 tenants.

6. In a statement to police James Dorsey related that he attempted to contact Williams numerous times in the past two days, without success. He then related that he forced entry through an adjacent room to find the victim.

7. A search warrant was executed at the crime scene on this date and as of this writing a firearm can not be located.

8. James Dorsey was asked to consent to gunshot/metal residue testing and consented. He was then asked that his vehicles be checked for any evidence of this crime and refused.

9. Police now wish to process two vehicles registered to James Dorsey located in close proximity to the crime scene, in the 400 block of Montgomery. Police wish to secure potential physical evidence of this crime.

The application indicated the police wanted to search for "any clothing or items that appeared to have the presence of blood" and "an unknown caliber handgun."

The police executed the search warrant for the two vehicles at approximately 7:50 p.m. Seized from the 1989 Cadillac DeVille were the following items: (1) a Smith and Wesson .38 Special; (2) a Harrington and Richardson Arms .38 Special; (3) a box of .38 Special ammunition and (4) photos of the vehicle.

## Motion to Suppress

Dorsey filed a Motion to Suppress the evidence that was seized pursuant to the warrant issued to search his two vehicles. The Superior Court held a hearing on the Suppression Motion over the course of three different days. At the initial Suppression Hearing, the State argued that probable cause to search Dorsey's vehicles was established within the four corners of the affidavit or, in the alternative, if the search warrant failed, a warrantless search of Dorsey's vehicles was valid pursuant to the automobile exception. When the Suppression Hearing resumed a few weeks later, the State withdrew the argument that probable cause to search Dorsey's vehicles existed outside of the affidavit. Accordingly, the Superior Court considered and ruled on the sole issue of whether the affidavit in support of the search warrant established probable cause.

The Superior Court issued a written decision denying Dorsey's Motion to Suppress. The rationale for the Superior Court's ruling was as follows:

Although the affidavit supporting the search warrant for Dorsey's two automobiles does not specifically state that Dorsey was a suspect in the death of Williams, there are sufficient facts in the warrant to infer that such was the case. Police stated in the affidavit that Dorsey told Police he had discovered the body by forcing entry into Williams' room. Dorsey told Police he had been out of town and since returning had been trying to contact Williams.

The Court also finds that, although the affidavit does not specifically state facts to support a belief that the gun used in the shooting or bloody items of clothing would be found in Dorsey's car, it is reasonable to infer probable cause, given the nature of the crime and the items sought by Police. The very proximity of the automobiles to the residence provided opportunity for concealment, regard-

less of whether Dorsey had driven either automobile that day. It is also reasonable to infer that Dorsey, had he shot Williams, might then have hidden the murder weapon in an automobile located nearby to which he had access.[2]

Based on the foregoing analysis, the Superior Court concluded that the warrant to search Dorsey's automobiles was supported by an affidavit establishing probable cause. Therefore, the Superior Court denied Dorsey's Motion to Suppress the evidence seized during the execution of that warrant.

## Delaware Search Warrants

The Delaware Constitution provides that a search warrant cannot be issued "unless there be probable cause supported by oath or affirmation."[3]

Section 6. The people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or thing, shall issue without describing them as particularly as may be; nor then, unless there be probable cause supported by oath or affirmation.[4]

Section 2306 of Title 11 of the Delaware Code prescribes specific statutory requirements that were promulgated by the General Assembly in furtherance of the Delaware Constitution's probable cause provision:

The application or complaint for a search warrant shall be in writing, signed by the complainant and verified by his oath or affirmation. It shall designate the house, place, conveyance or person to be searched and the owner or occupant thereof (if any), and shall describe the things or persons sought as particularly as may be, and shall substantially allege the cause for which the search is made or the offense committed

---

2. *State v. Dorsey,* Del.Super., I.D. No. 9609013822, 1997 WL 528273 (Aug. 1, 1997) (Op. and Order).

3. Del. Const. art. 1, § 6.

4. *Id.*

by or in relation to the persons or things searched for, and shall state that the complainant suspects that such persons or things are concealed in the house, place, conveyance or person designated and shall recite the facts upon which such suspicion is founded.[5]

Section 2307 authorizes a judicial officer to issue a warrant:

If the judge, justice of the peace or other magistrate finds that the facts recited in the complaint constitute probable cause for the search, that person may direct a warrant to any proper officer or to any other person by name for service. The warrant shall designate the house, place, conveyance or person to be searched, and shall describe the things or persons sought as particularly as possible, and may be made returnable before any judge, justice of the peace or magistrate before whom it shall also direct to be brought the person or thing searched for if found, and the person in whose custody or possession such person or thing is found, to be dealt with according to law.[6]

■ This Court has consistently held that Sections 2306 and 2307 contemplate a "four-corners" test for probable cause.[7] Pursuant to that time honored standard, sufficient facts must appear on the face of the affidavit so that an appellate court can verify the factual basis for the judicial officer's determination regarding the existence of probable cause.[8] "The requirement that all facts relied upon by the magistrate be in a written affidavit insures that the reviewing court may determine whether the constitutional requirements have been met without reliance upon faded and often confused memories."[9]

■ Consequently, the affidavit in support of a search warrant must set forth facts adequate for a neutral judicial officer to form a reasonable belief that an offense has been committed and that seizable property would be found in a particular place or on a particular person.[10] "This Court has eschewed a hypertechnical approach to the evaluation of the search warrant affidavit in favor of a common-sense interpretation."[11] Accordingly, we have held that "the affidavit supporting the search warrant must be 'considered as a whole and not on the basis of separate allegations.'"[12]

### Affidavits Deficient

■ Probable cause to search Dorsey's two automobiles exists if the affidavit sets forth facts that would permit an impartial judicial officer to *reasonably* conclude that the items sought would be found in those locations.[13] In determining whether probable cause has been demonstrated, there must be a *logical* nexus between the items sought and the place to be searched.[14] Accordingly, when this Court reviews the affidavit to determine if probable cause existed to search Dorsey's vehicles for "any clothing or items that appeared to have the presence of blood"

5.  11 *Del.C.* § 2306.

6.  11 *Del.C.* § 2307.

7.  *Pierson v. State*, Del.Supr., 338 A.2d 571, 573 (1975).

8.  *Id.*

9.  *Id.* at 574 (*quoting United States v. Acosta*, 5th Cir., 501 F.2d 1330 (1974)). *Accord Henry v. State*, Del.Supr., 373 A.2d 575, 577 (1977).

10.  11 *Del.C.* § 2306; *Edwards v. State*, Del. Supr., 320 A.2d 701, 703 (1974); *Wilson v. State*, Del.Supr., 314 A.2d 905, 906–07 (1973).

11.  *Gardner v. State*, Del.Supr., 567 A.2d 404, 409 (1989); *Jensen v. State*, Del.Supr., 482 A.2d 105, 111 (1984).

12.  *Gardner v. State*, 567 A.2d at 409 (*quoting Jensen v. State*, 482 A.2d at 111). *See Dunfee v. State*, Del.Supr., 346 A.2d 173, 175 (1975); *Edwards v. State*, 320 A.2d at 703; *Rossitto v. State*, Del.Supr., 234 A.2d 438, 439–40 (1967).

13.  *Hooks v. State*, Del.Supr., 416 A.2d 189, 203 (1980).

14.  *Id.*

and "an unknown caliber handgun," the information set forth within the affidavit's four corners, and any logical inference from the specific facts alleged, must demonstrate why it was objectively reasonable for the police to expect to find the items sought in those locations.[15]

In Dorsey's case, the four corners of the affidavit do not comport with Section 2306's requirement that the complaint "recite the facts" why the items sought would be found in Dorsey's vehicles.[16] When the nine paragraphs in the four corners of the affidavit are parsed seriatim, there is no logical deductive basis for a neutral judicial determination that there was probable cause to believe that either bloody clothing or a hand gun would be found in Dorsey's vehicles. The first paragraph states Dorsey called the police to report the crime. The second paragraph recites that Dorsey waited for the police to arrive, identified himself as the owner of the premises, explained the circumstances, and reported that there were multiple boarders in his property. The third paragraph provides that the police checked the crime scene and found the victim had sustained a single gun shot wound to the head. The fourth paragraph recounts that the police were unable to locate a weapon at the immediate crime scene. The fifth paragraph represents that the police were still trying to identify and interview all of the other tenants. The sixth paragraph reflects that Dorsey stated he forced entry into Williams' room because he had tried to contact Williams for two days without success. The seventh paragraph reports that the police had executed a search warrant for the entire premises and had not yet located a firearm. The eighth paragraph states that Dorsey voluntarily consented to be tested for gunshot and metal residue but refused a request to search his vehicles. The ninth paragraph, without any further attempt to explain why evidence would reasonably be expected to be found in Dorsey's vehicles, simply states: the police "wish" to process Dorsey's two vehicles and "wish" to secure potential physical evidence of the crime.

The Superior Court's written decision concluded that "the affidavit does not specifically state facts to support a belief that the gun used in the shooting or bloody items of clothing would be in Dorsey's car." [17] Nevertheless, the Superior Court inferred probable cause from "the nature of the crime and the items sought by the police." [18] The Superior Court did not base that inference on the information contained within the four corners of the affidavit, however, but instead based that inference on its own prior inference that the police suspected Dorsey. The Superior Court then speculated that if Dorsey did shoot Williams, he might have hidden the murder weapon in one of his nearby automobiles.

■ Probable cause to search and probable cause to arrest are not fungible legal concepts, and each involves a distinctly separate inquiry. The focus of probable cause to search is upon a "place", i.e., whether contraband or evidence will be found in a particular location. The focus of probable cause to arrest is upon a "person", i.e., whether a criminal offense has been or is being committed by the person to be arrested.

Earlier this year in Whitner, the Third Circuit reiterated that "probable cause to arrest does not automatically provide probable cause to search the arrestee's home." [19] The Third Circuit based that

**15.** Gardner v. State, 567 A.2d at 409; Hooks v. State, 416 A.2d at 203; Jensen v. State, 482 A.2d at 110–11; Henry v. State, Del.Supr., 373 A.2d 575, 577 (1977).

**16.** 11 Del.C. § 2306.

**17.** State v. Dorsey, I.D. No. 9609013822, 1997 WL 528273 (Aug. 1, 1997) (Op. and Order).

**18.** Id.

**19.** United States v. Whitner, 3d Cir., 219 F.3d 289, 297 (2000) (quoting United States v. Jones, 3d Cir., 994 F.2d 1051, 1055 (1993)).

holding on the well-established legal distinction that "search warrants are directed, not at persons, but at property where there is probable cause to believe that instrumentalities or evidence of crime will be found."[20] In *Jones*, the Third Circuit acknowledged, however, that "although probable cause to arrest does not automatically provide probable cause to search the defendant's home, the fact that probable cause to arrest has been established increases the probability that the defendant is storing evidence of that crime in the defendant's residence."[21]

The affidavit in support of the application to search Dorsey's vehicles does not state Dorsey had been arrested or even that he was suspected of committing any crime. The Superior Court *inferred* the police thought that Dorsey was a criminal suspect because they "wished" to search his vehicles. Assuming arguendo that the police "suspected" Dorsey, both the United States Constitution and Delaware Constitution require an impartial judicial officer to assess whether there is probable cause to conduct a search.[22] As the United States Supreme Court has explained, the purpose of the United States [and Delaware's] Constitution's requirement of demonstrating probable cause is not to deny law enforcement officers the support of usual inferences which reasonable individuals draw from objective evidence, but to require those inferences to be drawn by a detached judicial officer rather than the police officer.[23]

If probable cause to arrest does not automatically provide probable cause to search the arrestee's home, then *a fortiori* the *inference* that someone is a suspect does not constitute probable cause to search that suspect's home or automobiles. Nevertheless, the State argues that even if Dorsey was not an arrestee and even if Dorsey was not a suspect, "the Superior Court reasonably inferred that a murder weapon missing from a crime is likely to be concealed in an automobile parked in close proximity to the scene and registered to the person who first located the decedent." The State's argument is not the product of an orderly and logical deductive process.

This Court has held firsthand knowledge that the items identified in a warrant application are actually located in the place to be searched is not always required in an affidavit to establish probable cause.[24] In addition, we have held there is no requirement that the owner of the property to be searched or seized is even suspected of criminal activity.[25] Instead, this Court has framed the question as whether, based upon the specific facts alleged within the four corners of the affidavit, one would *normally* expect to find those items at that place.[26] "If so, then that inference will suffice to allow the valid issuance of a search warrant for that place."[27] It is illogical for the State to argue that it is "normal" to expect to find the murder weapon missing from a crime scene concealed in the automobile of the first person to discover a murder victim's body.

### No Probable Cause

In Dorsey's case, the four corners of the search warrant affidavit contained no information from which an impartial judicial officer could reasonably conclude or logically infer that there was probable cause to believe that evidence related to Williams' death inside of the boarding

---

**20.** *Id.* (*quoting United States v. Conley,* 3d Cir., 4 F.3d 1200, 1207 (1993)).

**21.** *United States v. Jones,* 994 F.2d at 1055–56.

**22.** *See Warden v. Hayden,* 387 U.S. 294, 301–02, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

**23.** *Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

**24.** *Hooks v. State,* Del.Supr., 416 A.2d 189, 203 (1980).

**25.** *Boardley v. State,* Del.Supr., 612 A.2d 150, 154 (1992) (*citing Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978)).

**26.** *Hooks v. State,* 416 A.2d at 203.

**27.** *Id.*

house would be found in one of Dorsey's two vehicles parked on the street. Since the warrant to search Dorsey's vehicles was issued without a demonstration of probable cause, we hold that Dorsey's rights under Article I, Section 6 of the Delaware Constitution and applicable statutes [28] were violated. We now address the remedy for those violations.

### Dual Sovereignty

■ This Court has consistently held that exclusion of evidence is the required remedy for a violation of the Delaware Constitution's protection against searches and seizures without probable cause.[29] The State argues that we should adopt the United States Supreme Court's interpretation of the federal exclusionary rule in *Leon*[30] and construe the Delaware Constitution to permit the use of evidence at trial that was seized without probable cause, if the police had a good faith belief that there was probable cause.[31] To reach that result, the State is asking this Court to overrule every one of its prior opinions construing the exclusionary rule under the Delaware Constitution.[32]

■ "The United States Constitution establishes a system of dual sovereignty: a federal government and state governments."[33] Each member of the Delaware judiciary takes an oath "to support and defend both the Constitution of my country [United States] and my State [Delaware]."[34] The Declaration of Rights in the Delaware Constitution is not a mirror image of the federal Bill of Rights.[35] Consequently, Delaware judges cannot faithfully discharge the responsibilities of their office by simply holding that the Declaration of Rights in Article I of the Delaware Constitution is necessarily in "lock step" with the United States Supreme Court's construction of the federal Bill of Rights.[36]

In *Sanders*, this Court stated that it was untenable for the State to argue that the Delaware Constitution must mean exactly the same thing as the United States Constitution.[37] The reason for that has been set forth succinctly by the United States Supreme Court: "State courts have available to them for decision a number of sources—state constitutions, statutes and common law—which are not available to us."[38] In *Sanders*, we explained the operation of dual sovereignty under the United States Constitution:

> Although Delaware is bound together with the forty-nine other States in an indivisible federal union, it remains a sovereign State, governed by its own laws and shaped by its own unique heritage. An examination of those laws and that heritage may, from time to time, lead to the conclusion that Delaware's citizens enjoy more rights, more constitutional protections, than the Federal Constitution extends to them. If we were to hold that our Constitution is simply a mirror image of the Federal Constitution, we would be relinquishing an important incident of this State's sovereignty. In a very real sense, Dela-

---

**28.** 11 *Del.C.* §§ 2306 and 2307.

**29.** *Rickards v. State*, Del.Supr., 77 A.2d 199 (1950); *Jones v. State*, Del.Supr., 745 A.2d 856 (1999).

**30.** *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

**31.** *Id.*

**32.** *See, e.g., Rickards v. State*, 77 A.2d at 204; *Jones v. State*, Del.Supr., 745 A.2d 856 (1999).

**33.** *Jones v. State*, 745 A.2d at 866.

**34.** Del. Const. art. XIV, § 1.

**35.** *Claudio v. State*, Del.Supr., 585 A.2d 1278, 1289 (1991).

**36.** "Under the lockstep formulation, changes or clarification of federal law by the United States Supreme Court lead to parallel changes in state constitutional law." Earl M. Maltz, *False Prophet—Justice Brennan and the Theory of State Constitutional Law*, 15 Hastings Const.L.Q., 429, 437–38 (1988).

**37.** *Sanders v. State*, Del.Supr., 585 A.2d 117, 144 (1990).

**38.** *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990).

ware would become less of a State than its sister States who recognize the independent significance of their Constitutions. Subject to the limits of the Supremacy Clause, no one would argue that our General Assembly should not legislate on subjects such as environmental protection merely because Congress has done so. Similarly, this State's judicial branch should not be foreclosed from interpreting our Constitution merely because the United States Supreme Court has interpreted similar provisions of the Federal Constitution.[39]

Until the adoption of the Fourteenth Amendment in 1868, the federal Bill of Rights protected individual rights solely against encroachment by the federal government.[40] Thereafter, the United States Supreme Court began to hold that selected provisions of the federal Bill of Rights also afforded protection against state action by virtue of the Due Process Clause of the Fourteenth Amendment.[41] Accordingly, from the Declaration of Independence until after the Civil War, state Declarations of Rights were the primary guarantors of individual rights and civil liberties against infringement by the state government.[42]

Within the last year, in *Jones*, this Court has had to decide whether the search and seizure language in the Delaware Constitution means the same thing as the United States Supreme Court's construction of *similar* language in Fourth Amendment of the United States Constitution.[43] In answering that question, we gave a comprehensive scholarly account of the historical differences in the search and seizure provisions in the Delaware and United States Constitution.[44]

The original Delaware Constitution and Declaration of Rights were adopted in September 1776—approximately two months after the Declaration of Independence and fifteen years *before* the federal Bill of Rights. The primary and repeated concern expressed in the Declaration of Independence was that the King had either denied or violated the American rights as English citizens. Consequently, virtually all of the first state constitutions contained explicit provisions[45] dealing with the retention or limited reception of English common law[46] and included Declara-

39. *Sanders v. State,* 585 A.2d at 145 (citations omitted).

40. *Barron v. Baltimore,* 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833). *See* Gerald Gunther, *Constitutional Law* 422–40 (11th ed.1985); *see also* Shirley S. Abrahamson, *Divided We Stand: State Constitutions in a More Perfect Union,* 18 Hastings Const.L.Q. 723, 727–38 (1991); Stanley Mosk, *State Constitutionalism: Both Liberal and Conservative,* 63 Tex. L.Rev. 1081, 1081–82 (1985); Stewart G. Pollock, *Adequate and Independent Grounds as a Means of Balancing the Relationship Between State and Federal Courts,* 63 Tex.L.Rev. 977, 979 (1985).

41. U.S. Const. amend. XIV ("... nor shall any State deprive any person of life, liberty, or property, without due process of law"). For discussions regarding the incorporation of the federal Bill of Rights into the Due Process Clause of the Fourteenth Amendment, thereby making them applicable to the states, see Richard C. Cortner, *The Supreme Court and the Second Bill of Rights: The Fourteenth Amendment and the Nationalization of Civil*

*Liberties* (1981); Akhil R. Amar, *The Bill of Rights and the Fourteenth Amendment,* 101 Yale L.J. 1193 (1992); Michael K. Curtis, *The Fourteenth Amendment and the Bill of Rights,* 14 Conn.L.Rev. 237 (1982); Charles Fairman, *Does the Fourteenth Amendment Incorporate the Bill of Rights?,* 2 Stan.L.Rev. 5 (1949); Louis Henkin, *"Selective Incorporation" in the Fourteenth Amendment,* 73 Yale L.J. 74 (1963).

42. Robert F. Utter & Sanford E. Pitler, *Presenting a State Constitutional Argument: Comment on Theory and Technique,* 20 Ind.L .Rev. 635, 641 (1987).

43. *Jones v. State,* Del.Supr., 745 A.2d 856, 864 (1999).

44. *Id.* at 864–67.

45. *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 137, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (Souter, J., dissenting).

46. *Id.* at 162 n. 55, 116 S.Ct. 1114.

tions of Rights, often based upon common law antecedents.[47]

Prior to the American Revolution, many aspiring colonial attorneys traveled to London to study law at the Middle Temple or one of the other English Inns of Court.[48] After their legal studies were completed, those individuals returned from London to practice law in colonial America. When he was Chief Justice of the United States Supreme Court, William H. Taft—previously President of the United States—wrote the Foreword to a book entitled "*American Members of the Inns of Court.*" According to Chief Justice Taft:

> This book contains proof of the instilling in all the communities of the Colonies of the principles of the Common Law as taught in the Inns of Court and by the decision of the English Judges.... Many of the law officers of the Colonies ... [had studied in London] at either the Middle Temple, the Inner Temple, Gray's Inn or Lincoln's Inn. When the [American] Revolution came on, the legal atmosphere of every community was permeated with the principles and the methods of the Common Law. So it was that the lawyers of the [American] Revolution who told part in the formation of the new Government brought to that great task—a deep respect for, and a close knowledge of, the Common Law.[49]

Article 25 of Delaware's 1776 Constitution provided:

> The common law of England, as well as so much of the statute law as have been heretofore adopted in practice in this state, shall remain in force, unless they shall be altered by a future law of the Legislature; such parts only excepted as are repugnant to the rights and privileges contained in this constitution and the declaration of rights, & c. agreed to by this convention.[50]

Delaware adopted the first search and seizure protections for its citizens in September of 1776 as part of the Declaration of Rights and Fundamental Rules of the Delaware State:

> That all warrants without oath to search suspected places or to seize any person or his property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend all persons suspected, without naming or describing the place or any person in special, are illegal and ought not to be granted.[51]

The primary authorship of Delaware's 1776 Constitution and Declaration of Rights is traditionally ascribed to Thomas McKean, a Delaware lawyer and signatory to the Declaration of Independence.[52] It is interesting to note that Thomas McKean had studied the English common law at the Middle Temple in London, where he was a contemporary of William Blackstone.[53] In the third volume of his authoritative Commentaries on the Laws of England, Blackstone wrote: "it is a settled and invariable principle in the laws of England, that every right, when withheld, must have a remedy, and every injury its proper redress." [54] In our view, it is logical to infer that by specifically adopting the existing common law of England, the framers of

**47.** Ellen A. Peters, *Common Law Antecedents of Constitutional Law in Connecticut,* 53 Alb. L.Rev. 259, 261 (1989).

**48.** Timothy Tyndale Daniell, *The Lawyers* 304 (1976). *See also* Sir Lyden Macarrey, Middle Templars' Association with America 27 (1998).

**49.** Chief Justice William H. Taft, *Foreword to* E. Alfred Jones, *American Members of the Inns of Court* (1924).

**50.** Del. Const. of 1776, art. XXV. *See also* Jonathan F. Hoffman, *By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions,* 74 Or.L.Rev. 1279, 1308 (1995).

**51.** Declaration of Rights and Fundamental Rules of the Delaware State § 17 (1776).

**52.** Randy J. Holland, *Introduction to The Delaware Bar in the Twentieth Century* xxviii (Helen L. Winslow et al., eds., 1994).

**53.** *Id.* at xxv. Sir Lyden Macarrey, Middle Templars' Association with America 27 (1998).

**54.** 3 William Blackstone, Commentaries *109 cited in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803).

Delaware's first Constitution and Declaration of Rights contemplated that there would be a remedy for the violation of the right to be free from illegal searches and seizures.[55]

Likewise, in our view, the framers of Delaware's first Declaration of Rights and Constitution did not contemplate excusing violations of the search and seizure right if the police acted in "good faith." Article 30 of Delaware's first constitution provided: "No article of the declaration of rights and fundamental rules of this state ... ought ever to be violated on *any pretence* whatever ..." [56] Excusing "good faith" violations of the constitutional right to be free from illegal searches and seizures is exactly the type of "pretence" that Article 30 in Delaware's 1776 Constitution expressly prohibited.

The President of the 1792 Delaware Constitutional Convention was John Dickinson, who had studied the common law of England at the Middle Temple in London with Thomas McKean and, thus, was also a contemporary of William Blackstone.[57] During the 1787 debates over the United States Constitution in Philadelphia, Dickinson referred to Blackstone's Commentaries to determine that the term *"ex post facto"* in the common law applied only in criminal cases.[58] When the 1792 Delaware Constitution was drafted, Dickinson was instrumental in retaining the common law right to trial by jury as "heretofore." [59]

It is logical to infer, in the absence of any provisions to the contrary, that John Dickinson and the other framers of Delaware's 1792 Constitution intended to continue the common law principle that there must be a remedy for the violation of any vested right.[60] The probable cause provision in the present Delaware Constitution and Declaration of Rights was added in 1792 and has never been changed.[61] When the probable cause element was added to the oath requirement for search warrants in Delaware's Declaration of Rights in 1792, it was an enhancement of the right against illegal searches and seizures rights set forth in Delaware's 1776 Constitution and Declaration of Rights.

In *Jones*, this Court concluded that the history of the search and seizure provisions in the Delaware Constitution reflected *different* and *broader* protections than those guaranteed by the Fourth Amendment.[62] The original search and seizure provision in the Delaware Constitution preceded the adoption of the Fourth Amendment by fifteen years and was originally like a similar provision in the Pennsylvania Constitution.[63] The Delaware Constitution was adopted in 1792 after the Fourth Amendment had already been adopted.[64] Nevertheless, the 1792 Delaware Constitution continued to follow the search and seizure language from the Pennsylvania Constitution rather than the language in the Fourth Amendment.[65]

**55.** 3 William Blackstone, Commentaries *109 *cited* in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803). *See also* Chief Justice William H. Taft Foreword to E. Alfred Jones *American Members of the Inns of Court* (1924).

**56.** Del. Const. of 1776, art. XXX.

**57.** *Johnson v. State,* Del.Supr., 711 A.2d 18, 24 (1998). *See also* Dennis R. Nolan, *Sir William Blackstone and the New Republic: A Study of Intellectual Impact.* 51 N.Y.U.L.Rev. 731, 743 n. 63 (1976).

**58.** Dennis R. Nolan, *Sir William Blackstone and the New Republic: A Study of Intellectual Impact.* 51 N.Y.U.L.Rev. 731, 745 n. 57 (1976).

**59.** *Claudio v. State,* Del.Supr., 585 A.2d 1278, 1296 (1991).

**60.** 3 William Blackstone, Commentaries *109 *cited in* *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803).

**61.** *Jones v. State,* Del.Supr., 745 A.2d 856, 865–66 (1999).

**62.** *Jones v. State,* 745 A.2d at 865–66.

**63.** *Id.* at 865–67.

**64.** *Id.*

**65.** *Id.*

### Delaware Constitutional Exclusionary Rule

■ "The exclusionary rule acts as a remedy for a violation of a defendant's right to be free of illegal searches and seizures. It provides for the exclusion from trial of any evidence recovered or derived from an illegal search and seizure."[66] The exclusionary rule in Delaware was recognized more than a decade before the federal exclusionary rule was extended to state prosecutions,[67] just as the enactment of the search and seizure provisions in the Delaware Declaration of Rights preceded the adoption of corresponding provisions in the federal Bill of Rights.[68]

Fifty years ago, in *Rickards*, the State also argued to this Court that the guarantees in Delaware's Constitution against unreasonable searches and seizures "does not require evidence obtained in violation of them to be excluded."[69] The State suggested that the appropriate remedy for individuals whose rights had been violated was not to have the evidence excluded at a criminal trial, but for those persons to file a civil action against the official who had invaded his or her rights under the Delaware Constitution.[70] This Court concluded "the efficient prosecution of criminals cannot justify a deliberate invasion of the right of the citizen to be made secure against the violation of specific constitutional guarantee's, and that the suggested remedy of a civil action is as a practical matter no remedy at all."[71] Accordingly, we held:

We conceive it the duty of the courts to protect constitutional guarantees. The most effective way to protect the guarantees against unreasonable search and seizure and compulsory self-incrimination is to exclude from evidence any matter obtained by a violation of them.

We believe that as long as the [Delaware] Constitution contains the [search and seizure] guarantees to the citizen referred to, we have no choice but to use every means at our disposal to preserve those guarantees. Since it is obvious that the exclusion of such matters from evidence is the most practical protection, we adopt that means. It is no answer to say that the rule hampers the task of the prosecuting officer. If forced to choose between convenience to the prosecutor and a deprivation of constitutional guarantees to the citizen, we in fact have no choice.[72]

Consequently, in construing the Delaware Constitution, this Court held that there are state constitutional dimensions to the enforcement of the exclusionary rule.

### Leon Distinguished

Ten years after *Rickards*, the United States Court held the federal exclusionary rule applicable to the States. "Since the Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth, it is enforceable against them by the same sanction of exclusion as is used against the Federal Government."[73] The United States Supreme Court, however, adopted the federal exclu-

66. *Id.* at 872 (*citing Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

67. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Prior to *Mapp*, the federal exclusionary rule was applicable only in federal proceedings. *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949); *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

68. *Rickards v. State*, Del.Supr., 77 A.2d 199 (1950); *Jones v. State*, Del.Supr., 745 A.2d 856, 865 (1999).

69. *Rickards v. State*, 77 A.2d at 204.

70. *Id.* at 205.

71. *Id.*

72. *Id.*

73. *Mapp v. Ohio*, 367 U.S. 643, 645, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

sionary rule on the basis of a different rationale than the basis for this Court's holding in *Rickards*.[74]

The United States Supreme Court has characterized its recognition of the federal exclusionary rule as a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved."[75] The "prime purpose" of the federal exclusionary rule "is to deter future unlawful police conduct."[76] Accordingly, in *Leon*, the United States Supreme Court modified the federal exclusionary rule to include an exception for good faith reliance by the police on a search warrant which is later held to be invalid for lack of probable cause.[77]

The minority contends that this Court should overrule *Rickards* and adopt the *Leon* "good faith" exception in "construing" the unambiguous mandate in Delaware's Constitution that no search warrant shall issue without probable cause.[78] The suggestion that we should adopt the rationale of *Leon* does not present an issue of first impression. In *Mason*, this Court explained why, even though the Delaware Constitution's requirement of probable cause *did* exist, there could be no good faith exception to the *enhanced statutory requirements* for the issuance of a nighttime search warrant.[79]

Our decision in *Mason* explained how the history of search and seizure in Delaware is different from that of the Fourth Amendment to the United States Constitution. "Delaware's independent interest in protecting its citizens against unreasonable searches and seizures did not diminish after the adoption of the Fourth Amendment...."[80] For almost 150 years, a Delaware statute has required *more* than probable cause for the issuance of a nighttime search warrant.[81] In addition to probable cause, a nighttime search warrant requires the affiant to allege that it is "necessary to prevent the escape or removal of the person or thing to be search for."[82] In *Mason*, the State argued that since the police demonstrated probable cause and had acted in "good faith," their failure to establish the enhanced specific statutory requirements for the issuance of a nighttime search warrant should not result in the exclusion of the illegally seized items from evidence.[83] This Court held:

> If this Court were to find a "good faith exception," under the circumstances of this case, it would be doing so in a situation where the police did not have exigent circumstances justifying a warrantless entry, failed to allege sufficient facts to satisfy the statutory requirements for a nighttime search of a residence and then failed to receive a search warrant that concluded its nighttime execution was necessary. To render such a decision would not only be an unprecedented break with more than two hundred years of history in this area of the law, but also would be tantamount to a judicial repeal of a specific Delaware statute that for more than one hundred years has set the standards by which applications for nighttime searches of a residence are to be judged by impartial magistrates.[84]

---

**74.** *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

**75.** *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

**76.** *Id.* at 347, 94 S.Ct. 613.

**77.** *United States v. Leon*, 468 U.S. 897, 913, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

**78.** *Id.*

**79.** *Mason v. State*, Del.Supr., 534 A.2d 242 (1987).

**80.** *Id.* at 248.

**81.** *Id.*

**82.** 11 *Del.C.* § 2308.

**83.** *Mason v. State*, 534 A.2d at 254–55.

**84.** *Id.*

*A fortiori*, there can be no good faith exception when the probable cause requirement in the Delaware Constitution is absent—as in this case.

The Delaware Constitution requires actual probable cause for the issuance of a search warrant not "a good faith belief in probable cause." This Court cannot disregard the probable cause requirement explicitly set forth in the Delaware Constitution. The entire purpose of having a police officer present his or her belief in probable cause to a neutral magistrate is to protect Delaware's citizens against the issuance of search warrants without probable cause.

"The preservation of diversity in the legal and governmental systems of each state was expressly contemplated when the United States Constitution was framed and adopted."[85] The United States Supreme Court has acknowledged that state constitutional rights are frequently different from and broader than the federal Bill of Rights.[86] A great many state supreme courts, more recently Iowa,[87] have concluded that the rationale in *Leon* is inconsistent with state constitutional dimensions to the enforcement of the exclusionary rule.[88] In *Jones*, this Court again held that those "dimensions are correlative to fundamental Delaware state constitutional rights and to preserving the integrity of the judicial system in Delaware."[89]

### Rights Require Remedies

The issue on appeal relates to very specific language in the Delaware Constitution: "no warrant to search any place ... shall issue ... unless there be probable cause supported by oath or affirmation."[90] In this case, the *absence* of probable cause is not an issue. Instead, the real dispute between the majority and the minority turns on whether the Delaware Constitution provides a remedy when items are seized pursuant to a search warrant that was issued without probable cause.

That question is not an issue of first impression. Fifty years ago, in *Rickards*, this Court held that a violation of the Delaware Constitution's right not to be searched pursuant to a warrant that was issued without probable cause required a constitutional remedy—exclusion of the illegally seized items from evidence at trial.[91] The majority has concluded that *Rickards* was correctly decided and has applied that venerable construction of the Delaware Constitution to this case.

The minority concludes that when there is a good faith violation of the probable cause requirement in Delaware's Constitution, there is no constitutional remedy. Blackstone's Commentaries were cited by Chief Justice John Marshall "several times in support of the proposition that the law must furnish a remedy for the violation of a vested legal right."[92] Almost two centuries ago, in *Marbury v. Madison*, Chief

**85.** *Jones v. State*, Del.Supr., 745 A.2d 856, 874 (1999). *See* Randy J. Holland, *State Constitutions: Purpose and Function*, 69 Temp.L.Rev. 989, 998–99 (1996).

**86.** *See Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

**87.** *State v. Cline*, 617 N.W.2d 277, 2000 Iowa Sup. LEXIS 152 (2000) (In footnote 3 noting that the good faith exception has been rejected under the state constitutions of Alaska, Connecticut, Idaho, Michigan, New Hampshire, New Jersey, New Mexico, Nevada, North Carolina, Pennsylvania and Vermont.).

**88.** *Jones v. State*, 745 A.2d at 873. *See* John E. Theuman, Annotation, *State Constitutional Requirements as to Exclusion of Evidence Un-*

*lawfully Seized—Post*–Leon *Cases*, 19 A.L.R.5th 470 (1994). *See also* Jennifer Friesen, *State Constitutional Law* § 11–5(b) (2d ed. 1996 & Supp.1999).

**89.** *Jones v. State*, 745 A.2d at 873.

**90.** Del. Const. art. I, § 6.

**91.** *Id.; Rickards v. State*, Del.Supr., 77 A.2d 199 (1950).

**92.** Dennis R. Nolan, *Sir William Blackstone and the New Republic: A Study of Intellectual Impact.* 51 N.Y.U.L.Rev. 731, 732 (1976).

Justice Marshall, relying on Blackstone's Commentaries, eloquently stated: "The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right." [93] In our system of dual sovereignty, the government of Delaware is also a government of laws. Without a constitutional remedy, a Delaware "constitutional right" is an oxymoron that could unravel the entire fabric of protections in Delaware's two hundred and twenty-five year old Declaration of Rights.

### Evidence Excluded

██ Both before and after *Leon*, in construing the Delaware Constitution, this Court held that there are state constitutional dimensions to the enforcement of the exclusionary rule.[94] We remain convinced that there are constitutional dimensions to the remedy for a violation of the Delaware Constitution's Declaration of Rights. Accordingly, we adhere to our prior holdings in *Rickards* and its progeny, including our most recent holding in *Jones:* exclusion is the constitutional remedy for a violation of the search and seizure protections set forth in Article I Section 6 of the Delaware Constitution.[95] Therefore, the evidence seized from the search of Dorsey's two vehicles, without probable cause, must be suppressed.

### Conclusion

Dorsey's judgment of conviction in the Superior Court for Possession of a Firearm by a Person Prohibited is reversed. This matter is remanded for further proceedings in accordance with this opinion.

93. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803).

94. *Jones v. State*, Del.Supr., 745 A.2d 856 (1999); *Rickards v. State*, Del.Supr., 77 A.2d 199 (1950).

95. *Jones v. State*, 745 A.2d at 873–74; *Rickards v. State*, Del.Supr., 77 A.2d 199 (1950).

BERGER, Justice, dissenting.

The majority holds that there is no "good faith" exception to the exclusionary rule under the Delaware Constitution. But it does not rest its conclusion on any analysis of the exception or its impact on the rights sought to be protected by the exclusionary rule. Instead, the majority says that: (i) Delaware's constitutional safeguard against unreasonable searches and seizures is different from and broader than the similar protection found in the Fourth Amendment; and (ii) this Court could not adopt a good faith exception to the exclusionary rule without overruling precedents spanning 50 years. In fact, this is a case of first impression, and even if the State and Federal Constitutions are to be interpreted differently, the good faith exception to the exclusionary rule should be recognized under Delaware law.

As the majority points out, a prior version of Article I, Section 6 of the Delaware Constitution does predate the Fourth Amendment to the United States Constitution. That said, the language of the two provisions is "substantially identical" [96] and, until last year, this Court followed federal law on search and seizure issues without finding any differences in the constitutional protections afforded under state law. In *Rickards v. State*, for example, this Court adopted the United States Supreme Court's exclusionary rule, finding that the two constitutional guarantees are, "for all practical purposes, identical," [97] and that the federal exclusionary rule is "the most effective way to protect the guarantees against unreasonable search and seizure...." [98] This Court continued to follow federal law in *Cook v. State*,[99] when we adopted the "inevitable discovery" exception to the exclusionary rule, and in *Mason v. State*,[100] when we recog-

96. *Rickards v. State*, Del.Supr., 77 A.2d 199, 204 (1950).

97. *Ibid.*

98. *Id.* at 205.

99. Del.Supr., 374 A.2d 264 (1977).

100. Del.Supr., 534 A.2d 242 (1987).

nized the "exigent circumstances" doctrine as an exception to the search warrant requirement.

Until last year, this Court had "never decided whether, and in what situations, Article I, § 6 of the Delaware Constitution should be interpreted to provide protections that are greater than the rights accorded citizens by the Fourteenth Amendment as it has been interpreted by the United States Supreme Court."[101] In *Jones v. State,* a majority of this Court found that the United States Supreme Court's *California v. Hodari D.*[102] decision was "not consistent with our view of when a person is 'seized' within the meaning of Article I, § 6 of the Delaware Constitution...."[103] Accordingly, the majority in *Jones* refused to follow federal law on this point, and held that a person is seized, under Article I, Section 6 of the Delaware Constitution, "when a reasonable person would have believed he or she was not free to ignore the police presence."[104]

The majority now finds another difference between our State and Federal Constitutions. Under federal law, evidence obtained with a search warrant that is later held to be invalid will not be suppressed as long as the police officer "[acted] with objective good faith ... obtained a search warrant from a judge or magistrate and acted within its scope."[105] The majority holds that this "good faith" exception to the exclusionary rule does not apply in our state because "exclusion is the constitutional remedy for a violation of the search and seizure protections ... of the Delaware Constitution."

The majority suggests that its conclusion is the only one permitted under existing case law, and that the dissenters would force the Court to reverse ancient and respected precedent to rule otherwise.

That is not so. Neither *Rickards* nor *Mason* addressed this issue. *Rickards* was decided long before *Leon* and simply adopted the federal exclusionary rule. *Mason,* which was decided after *Leon,* expressly stated that "Leon is not applicable to the questions presented in this appeal."[106]

When the exclusionary rule was adopted by this Court, it was considered the most practical remedy for an invasion of a person's right to be free from unreasonable searches and seizures. The *Rickards* court noted that police efforts to thwart crime cannot justify a "deliberate invasion" of a citizen's constitutional rights.[107] In *Cook,* however, this Court recognized that suppression of evidence is not always the appropriate remedy for a deliberate violation of the constitutional protection against unreasonable searches and seizures. The *Cook* court held that, notwithstanding the exclusionary rule, illegally seized evidence is admissible when the police can show that they would have discovered that evidence, eventually, through lawful means. Since the *Cook* decision establishes that there are some exceptions to the exclusionary rule, this Court should examine the good faith exception to see whether it, too, should be recognized.

There are several reasons why the good faith exception should be adopted in Delaware. First, to the extent that the exclusionary rule is intended to deter police misconduct, it serves no purpose in the circumstances that would give rise to the good faith exception. A police officer who (i) prepares an affidavit of probable cause, which the officer reasonably believes is sufficient to obtain a warrant, and (ii) presents it to an independent magistrate, who also concludes that the affidavit supports

**101.** *Jones v. State,* 745 A.2d 856, 861 (1999).

**102.** 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).

**103.** 745 A.2d at 863.

**104.** 745 A.2d at 869.

**105.** *United States v. Leon,* 468 U.S. 897, 920, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

**106.** *Mason v. State,* 534 A.2d at 254.

**107.** 77 A.2d at 205.

the issuance of a warrant, is doing exactly what the law requires. The officer is making a good faith, objectively reasonable effort to protect our citizens' privacy rights by securing a warrant. Since the officer believes she/he is upholding the constitution, suppression of the seized evidence, based on a later finding that the warrant was defective, will not deter future "misconduct."

The majority suggests that suppression is not intended to deter police abuses, but to remedy the unconstitutional invasion of an individual's privacy. If that is so, then why is there an exception for evidence obtained through intentional police misconduct just because the evidence would have been discovered lawfully at some later time? The individual's constitutional rights are violated, but we provide no suppression remedy. And since we countenance knowing constitutional violations where the police make no effort to comply with the law, certainly we should condone unknowing constitutional violations where the police are attempting to fully comply with the law.

Finally, it is good public policy to promote consistency in our laws. The majority's suggestion that judges would be violating their oaths of office if they interpret the State and Federal Constitutions uniformly is wrong. Where, as here, the two constitutional provisions are virtually identical, and there is a long history of interpreting them consistently, this Court should deviate from federal interpretations only if there are compelling reasons to do so. The majority has offered no compelling reasons and I find none. Accordingly, I respectfully dissent.

HARTNETT, Justice, dissenting:

I respectfully dissent and agree with Justice Berger that we should affirm. I would affirm because, in my opinion, the totality of the circumstances support a finding that there was sufficient probable cause for the issuance of the search warrant and therefore there was no violation of 11 *Del.C.* § 2306 or the Delaware or federal Constitutions. If there was any question whether the search warrant was properly issued, the record shows that the police acted in good faith in reliance on the warrant in accordance with the rule adopted by the United States Supreme Court in *United States v. Leon.*[108]

I find no Delaware Constitutional impediment to the adoption by us of the good faith exception to the evidentiary exclusionary rule as set forth in *Leon* and I agree with Justice Berger that, as a matter of public policy, it should be adopted in Delaware. In my opinion, in a murder investigation, the good faith exception rule represents a reasonable balance between the right of an owner of a motor vehicle that might contain a weapon to be free from an *unreasonable* search and the right of an individual to be safe from harm. There is, therefore, in my opinion, no legal bar to the introduction into evidence of the weapon that was found in Dorsey's motor vehicle.

I.

The majority relies, in part, on *Jones v. State,*[109] a case in which I concurred in the result but where I thought it was undesirable for this Court to reach the constitutional issues in view of the provisions of 11 *Del.C.* § 1902.[110] In applying that statute to the facts in *Jones,* I believed that the totality of the circumstances there did not adequately support a finding of probable cause justifying the seizure and searching of Jones without a warrant. I, therefore, concurred in the result without considering the Constitutional arguments. In the present case, however, although the affidavit supporting the warrant could have been better drafted, I find that the totality of the circumstances reasonably showed a sufficient basis for the Superior Court judge to have issued the warrant authoriz-

---

**108.** 468 U.S. 897, 104 S.Ct. 3405 (1984).

**109.** Del.Supr., 745 A.2d 856 (1999).

**110.** *Id.* at 874 (Hartnett, J., concurring).

ing a search of the motor vehicle and therefore there was no statutory or constitutional violation.[111]

## II.

I also find nothing in our case law nor in the Delaware Constitution of 1897 (or in its predecessors) that precludes our adopting the good faith exception rule adopted by the United States Supreme Court in *Leon.*

In 1914 in *Weeks v. United States,*[112] the United States Supreme Court held that evidence obtained by means of an unlawful search and seizure by federal officers is not admissible against an accused in a federal criminal trial. The exclusionary rule thus established was based on the prohibition against unreasonable searches and seizures in the Fourth Amendment to the Federal Constitution and did not affect the admissibility of evidence in state courts. In 1961 in *Mapp v. Ohio,*[113] the United States Supreme Court extended the exclusionary rule to state courts. Delaware had earlier reached the same conclusion in *Rickards v. State.*[114]

In 1984 in *Leon,* the United States Supreme Court held that the Fourth Amendment to the Federal Constitution, itself, does not expressly preclude the use of evidence obtained by officers *acting in reasonable reliance on a search warrant, that is later found to be defective.* This is now known as "the good faith exception rule ." Since then, some states have not considered the rule, while others have either adopted it or rejected it. 19 ALR 5th 470, 487. In *State v. Bolt,*[115] the Arizona Supreme Court, after reviewing the pros and cons of alternative means of deterring illegal searches by the police, adopted the good faith exception rule as a matter of state public policy. I agree with that reasoning.

## III.

Because the good.faith exception to the exclusionary rule is not precluded by the Delaware Constitution, or any statute or precedent, the issue before us is whether, as a matter of public policy, the good faith exception rule should be adopted in Delaware. I believe it should be.

The first Delaware Constitution, in 1776, incorporated a Declaration of Rights and Fundamental Rules of the Delaware State. Section 17 stated:

That all warrants without oath to search suspected places, or to seize any person or his property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend all persons suspected, without naming or describing the place or an person in special, are illegal and ought not to be granted.[116]

I find nothing in that language that precludes a good faith exception to any later judicially-created exclusionary rule and there is no evidence that the delegates to that Convention considered an exclusionary rule or any good faith exception thereto.

In any case, the 1776 Constitution with its Declaration of Rights ceased to be the Constitution of Delaware or to have any force when it was *replaced* (not amended) by the Delaware Constitution of 1792 that was promulgated by the delegates on June 12, 1792. The Delaware Constitutional Convention of 1792 was convened, in large part, because of the adoption of the United States Constitution in 1789 and its Bill of Rights (the first ten amendments) in 1791.[117] The Bill of Rights had been ratified by Delaware on January 28, 1790.

---

**111.** *See Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

**112.** 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

**113.** 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

**114.** Del.Supr., 77 A.2d 199 (1950).

**115.** 142 Ariz. 260, 689 P.2d 519 (1984).

**116.** Declaration of Rights and Fundamental Rules of the Delaware State § 17 (1776).

**117.** See Jeannete Eckman, *Constitutional Development 1776–1897 in Delaware: A History of the First State,* 284–85 (H. Clay Reed, ed., 1947).

The Delaware Constitution of 1792 provided in Section 6: "The people shall be secure in their persons, houses, papers, and possessions, from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as particularly as may be; nor then; unless there be probable cause supported by oath or affirmation." That language was readopted (with only stylistic changes) in the Delaware Constitution of 1831 that replaced the 1792 Constitution. Our current Constitution, which replaced the 1831 Constitution, also adopted the same language in Art. I § 6.

In *Rickards v. State*,[118] this Court stated: "Article I, Section 6, of the [1897] Constitution of Delaware is *substantially identical* with the Fourth Amendment of the Federal Constitution preventing unreasonable searches and seizures. Article I, Section 7, of the Constitution of Delaware prohibits compulsory self-incrimination and is *substantially the same* as the Fifth Amendment of the Federal Constitution."[119] I agree. As the Supreme Court of the United States held in *Leon*, there is nothing in that Constitutional language that addresses a good faith exception to the judicially created exclusionary rule that was created long after 1897. In *Rickards* this Court adopted the exclusionary rule for Delaware because it was persuaded by the reasoning of the United States Supreme Court in *Weeks* and its progeny.[120]

In my opinion, the cases relied on by the majority are not persuasive. In *Mason v. State*,[121] the challenged search of the defendant's apartment took place during the nighttime without a warrant. Subsequent to the search, a warrant was obtained that this Court held did not meet the exigent circumstances mandate of 11 *Del.C.* § 2308, the Delaware nighttime search statute.[122] In *Rickards* and *Sanders v. State*,[123] this Court did not discuss good faith reliance. A court, in construing a constitution, should begin by using the same principles of law used to construe an Act of the General Assembly.[124] In construing a statute a court must attempt to ascertain the intent of the enacting body. In the case of a state Constitution, a court should consider the intent of its framers and the initial focus is always on the text.[125] In *Commonwealth v. Edmunds*,[126] the Pennsylvania Supreme Court acknowledged that it went beyond the text and history of the Pennsylvania Constitution. It also relied on certain criminal rules of Pennsylvania. In *State v. Hunt*,[127] the New Jersey Supreme Court acknowledged that State policy reasons justified its departure from federal precedents construing the Fourth Amendment to the federal Constitution.

Because no stenographic record of the debates of the Delaware Constitutional Conventions prior to the 1897 Convention exists, it is virtually impossible to find any valid aid to construction other than the primary one: the text itself. In 1897, the delegates to the Constitutional Convention

118. Del.Supr., 77 A.2d 199 (1950).

119. *Id.* at 204 (emphasis added).

120. *See also Cook v. State*, Del.Supr., 374 A.2d 264 (1977); *Garner v. State*, Del.Supr., 314 A.2d 908 (1973).

121. Del.Supr., 534 A.2d 242 (1987).

122. The Court stated "We find that *Leon* is not applicable to the questions presented in this appeal." 534 A.2d at 254.

123. *Sanders v. State*, Del.Supr., 585 A.2d 117 (1990). *Sanders* involved the issue of the effect of a jury verdict of "guilty but mentally ill" and not search and seizure.

124. *Turnbull v. Fink*, Del.Supr., 668 A.2d 1370, 1378 n. 7 (1995).

125. *Alfieri v. Martelli*, Del.Supr., 647 A.2d 52, 54 n. 1 (1994).

126. 526 Pa. 374, 586 A.2d 887, 901 (1991).

127. 91 N.J. 338, 450 A.2d 952, 955 (1982).

agreed to adopt without change the bill of rights as contained in the Delaware Constitutions of 1792 and 1831.[128] In *Rickards* the Delaware Supreme Court found that Article I § 6 of the Delaware Constitution is *substantially identical* to the text of the Fourth Amendment to the federal Constitution. As the United States Supreme Court found in *Leon,* there is no language in the Fourth Amendment that addresses the issue of a good faith exception to the judicially created exclusionary rule. I am also convinced it was the United States Constitution of 1789 that was the primary impetus for the Delaware Constitution of 1792 that *replaced* the Delaware Constitution of 1776.[129] In my opinion, we are free to adopt the good faith exception rule as adopted by the United States Supreme Court in *Leon* and should do so as a matter of good state policy.

### IV.

In summary, I agree with Justice Berger that the judgment of the Superior Court be affirmed. There is, in my opinion, no binding Delaware Constitutional provision or precedent that either adopts the *Leon* good faith exception to the exclusionary rule or precludes its adoption by us. If the *Leon* good faith exception is to be rejected, it must. be done so on the basis of public policy, not *dicta,* statutes or historical speculation.[130] In my opinion, the good faith exception rule (as adopted by the United States Supreme Court in *Leon* ), as a matter of state policy, constitutes a proper balance between the rights of an owner of a motor vehicle that contains a weapon to protection against an *unreasonable* search and the rights of individuals to life. It should, therefore, be adopted in Delaware.

---

128. Rodman Ward, Jr. and Paul J. Lockwood, in *The Delaware Constitution of 1897,* 78–79 (Randy J. Holland, ed., 1997).

129. Jeannete Eckman, *Constitutional Development 1776–1786 in Delaware: A History of the First State,* 284–85 (H. Clay Reed, ed., 1947).

130. "History never embraces more than a small part of reality." La Rochefoucauld.