STATE of Delaware

v.

Steven HENDERSON, Defendant.

Crim. A. Nos. IN–04–04–1104, IN–04–04–1105.
ID No. 0403013451.

Superior Court of Delaware,
New Castle County.

Submitted: Nov. 10, 2004.

Decided: Jan. 11, 2005.

John A. Barber, Deputy Attorney General, Department of Justice, for State of Delaware.

Joseph A. Hurley, of Wilmington, DE, for the defendant.

## OPINION

HERLIHY, Judge.

Defendant Steven Henderson has moved to suppress the taking of a gun recovered from him during a seizure and pat-down frisk. The police stopped Henderson, a Michael Jones, and a third individual while they were leaving a Boys and Girls Club and headed toward a vehicle. The police were there to execute a DEA drug warrant on Jones. All three were seized and patted down prior to getting into their vehicle. After being seized, Henderson was patted down and a gun was discovered.

Henderson was not originally to be arrested. Prior to the discovery of the gun, he was not suspected in or of anything and there is nothing in this record that he was a known associate of Jones. While observing the three individuals leave the club and walk toward the vehicle, the police observed no activity by Henderson which would give rise to reasonable articulable suspicion of criminal activity. The police were there in force and had blocked in the vehicle the three were about to get into. Henderson was cooperative at all times.

Under the circumstances, it is uncontradicted Henderson had been seized. The issue is whether the companion of a person to be arrested, but for whom there is no probable cause to arrest and who has done nothing which would give rise to reasonable articulable suspicion, can be lawfully seized and frisked. Without probable cause to arrest or reasonable articulable suspicion to seize, the only basis justifying the seizure is the so-called "automatic companion rule," that is, he was in the company of a person to be arrested. The United States Supreme Court has never opined on or used this rule. There is a split of Circuit Court opinions on it. The Delaware Supreme Court has never rejected it or adopted the rule.

This Court finds that if the case were to be decided alone on federal case law, even with this divergence of opinions, Henderson's motion might be denied. But based on the Delaware Supreme Court's holdings that the search and seizure provision in our constitution provides greater protection than that in the U.S. Constitution, this Court is compelled to grant Henderson's motion.

## Statement of Facts

Delaware State Police Detective Don Pope was on special assignment to the Drug Enforcement Agency. The DEA had obtained a warrant for the arrest of a Michael Jones for drug activity. The warrant is not in the record. On January 25, 2004, the authorities received a tip that Jones was or would be playing basketball at the Boys and Girls Club on U.S. Route 40. The decision was made to arrest Jones there.

To effectuate the arrest five to six law enforcement officers were assigned. Among them was Delaware State Police Officer Edward Schiavi, who was assigned at that time to the State Police Drug Unit. Schiavi testified about a briefing held before the officers went to the Club. He could not recall, however, whether the assembled officers were shown a picture of Jones in advance. After the briefing, the officers went to the Club arriving between 11 a.m. and 12 p.m.

Eventually three males emerged from the Club headed toward one of the vehicles. The parking lot has spaces for 20–40 vehicles. Schiavi said Detective Pope recognized one of the three as Jones; although, there is nothing in the record to indicate if Jones was singled out of the three as they crossed the lot.

The three headed toward a SUV. A person, who turned out to be Henderson, was carrying a bag and walked to the driver's side. The other two went to the passenger side. Schiavi pulled his police car in front of the SUV blocking it in. Schiavi had his window down. He testified he showed his badge and said, "State Police." He directed Henderson to drop the bag he had been carrying. Henderson did. Schiavi directed Henderson to put his hands on the hood of the SUV. Henderson, again, complied.

Schiavi got out of his vehicle. He testified that at this moment he did not know which one of the three was Jones. Basically, he said, it did not matter to him because anyone with Jones, an alleged drug dealer, was a threat. He also said Henderson was a threat until he was identified and "secured." It was not determined that Henderson was not Jones until after he was arrested, according to Schiavi.

Henderson was wearing a three-quarter length coat. Schiavi patted him down while Henderson had his hands on the hood of the SUV. Up until that point, Henderson had been cooperative and neither he nor the other two individuals had made any furtive or suspicious moves. As Schiavi patted down Henderson, he first felt or saw a gun in the pocket of Henderson's coat. It is unclear whether the first sensation of the gun was by feel or sight, but whichever was first, the other followed almost immediately. Schiavi's other hand was on Henderson's shoulder as he frisked him and came across the gun. Schiavi told the other officers he had found a gun: then he handcuffed, and arrested Henderson. Henderson had not struggled while being patted down.

It is the seizure of the gun which Henderson has moved to suppress.

## Parties' Claims

The defendant argues that he was seized as defined by case law. He agrees that when a person has been validly seized, there is a right to conduct a protective frisk. But, he asserts, that right to conduct such a frisk extends only to the person who is the suspect of criminal activity or to be arrested and not others who are merely accompanying that suspect. He claims that what is colloquially known as the "automatic companion" rule, which would otherwise permit this pat-down, has been rejected by the United States Su-

preme Court in *Ybarra v. Illinois.*[1] He also contends that no Delaware court has adopted the automatic companion rule as a sole basis for permitting such a seizure and pat-down. He argues that his seizure violates the Delaware Constitution.

The State counters that the federal and state constitutions permit the stop and frisk of a companion of an arrestee. It relies upon *Hunter v. State*[2] as authority to stop and frisk the companion of an arrestee to sustain the seizure and search in this case.

### Discussion

■ This was a warrantless search of Henderson. As such, the State has the burden of proof of showing the propriety of the search.[3] Normally, to conduct a pat-down search of a person who is not under arrest but who is being detained, the police must have a reasonable articulable suspicion.[4] Here there is nothing in the record to indicate that the police had any reasonable articulable suspicion that Henderson had committed or was about to commit a crime. He made no furtive moves, did not act suspiciously, and was fully cooperative.

Henderson was not wanted for anything, nary a warrant or a capias. He was in the company of a person who was wanted on a DEA drug warrant and who was to be arrested. There is no evidence the police knew who Henderson was before he was arrested and identified. Nor is there any evidence the police know him to be a companion of Jones, the person to be arrested.

■ The area where all this took place was in the parking lot of the Boys and Girls Club. It was mid-day. Without seeming to be cute, neither the Club nor its parking lot is or was described, as often is cited in so many cases,[5] a high drug activity area. The police were not in the area to surveil for drug activity or in response to complaints of drug activity. They were there for a single purpose; to arrest Jones. Jones was not even at the Club, as far as the police had been informed, for an illegal purpose. Further, it is indisputable that Henderson was seized in the constitutional sense.[6] His vehicle was blocked in. Schiavi identified himself as a police officer. Schiavi told Henderson to drop his bag, which he did, and put his hands on the hood of his vehicle, which Henderson did. While using one hand to pat-down Henderson, Schiavi had his other hand on Henderson's shoulder.

In short, all the usual bases for seizing Henderson and then conducting a pat-down search are absent in this case. The only potentially constitutionally permissible basis for what happened here is to apply the automatic companion rule, and the issue is whether it can be applied to either under the federal or State constitutions, or both.

### U.S. Constitution

The seminal case for what has become known as the "automatic companion rule" is *United States v. Berryhill.*[7] The Court in that case defined the rule in this fashion:

**1.** 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979).

**2.** 783 A.2d 558 (Del.2001).

**3.** *Id.,* 783 A.2d at 560.

**4.** *Purnell v. State,* 832 A.2d 714, 720 (Del. 2003).

**5.** *Hoey v. State,* 689 A.2d 1177, 1178 (Del. 1997).

**6.** *Jones v. State,* 745 A.2d 856 (Del.1999).

**7.** 445 F.2d 1189 (9th Cir.1971).

In addition to the vehicular search, we are here concerned with the right to search another occupant of the vehicle, Mrs. Clarice Berryhill, who was clutching the handbag in which the stolen mail matter described in Counts VI and XIII was found. The fact that envelopes were observed protruding from the top of the paper sack might arguably have supported the reasonableness of the search, but the arresting officer described it as purely a search for weapons. And the lawful arrest of Berryhill cannot legalize a personal search of a companion for evidence against her simply because she was there. The Supreme Court, however, has clarified the right of peace officers to protect themselves from the reasonably anticipated possibility of assault. In *Terry v. Ohio,* the Court affirmed the right of a limited search "to assure * * *that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him" despite the absence of probable cause for an arrest. We think that *Terry* recognizes and common sense dictates that the legality of such a limited intrusion into a citizen's person privacy extends to a criminal's companions at the time of arrest. It is inconceivable that a peace officer effecting a lawful arrest of an occupant of a vehicle must expose himself to a shot in the back from defendant's associate because he cannot, on the spot, make the nice distinction between whether the other is a companion in crime or a social acquaintance. All companions of the arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the cursory "pat-down" reasonably necessary to give assurance that they are unarmed.[8]

But Henderson claims this rule is inconsistent with the United States Supreme Court holding in *Ybarra v. Illinois.*[9] In that case, the Supreme Court said:

> It is true that the police possessed a warrant based on probable cause to search the tavern in which Ybarra happened to be at the time the warrant was executed. But, a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.[10]

In *Ybarra,* the police obtained a search warrant to search a bar, a particular bartender alleged to be selling heroin, and for related evidence of drug sales, money, etc. When executing the warrant, there were patrons in the bar. All the officers patted-down each of the customers. Ybarra was one. An officer on an initial pat-down felt something in his pants pocket like a cigarette pack with objects in it. After patting down other customers, the officer returned to Ybarra and removed the cigarette pack. Six tinfoil packets of heroin were located inside.

With striking similarity to many facts in this case, the Supreme Court said:

> We are unable to take even the first step required by this argument. The initial frisk of Ybarra was simply not supported by a reasonable belief that he was armed and presently dangerous, a belief which this Court has invariably held must form the predicate to a pat-down of a person for weapons. When the police entered the Aurora Tap Tavern on March 1, 1976, the lighting was sufficient for them to observe the customers. Upon seeing Ybarra, they nei-

---

**8.** *Id.* at 1193.

**9.** *Supra.,* fn. 1.

**10.** *Id.,* 444 U.S. at 91, 100 S.Ct. at 342, 62 L.Ed.2d at 245.

ther recognized him as a person with a criminal history nor had any particular reason to believe that he might be inclined to assault them. Moreover, as Police Agent Johnson later testified, Ybarra, whose hands were empty, gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening. At the suppression hearing, the most Agent Johnson could point to was that Ybarra was a three-quarter length lumber jacket, clothing which the State admits could be expected on any tavern patron in Illinois in early March. In short, the State is unable to articulate any specific fact that would have justified a police officer at the scene in even suspecting that Ybarra was armed and dangerous.[11]

Several circuits adopted the automatic companion rule. But each of those decisions were rendered prior to *Ybarra.*[12] In no instance, however, has any of those circuits revisited its ruling since *Ybarra.*

Other circuits have declined to adopt *Berryhill's* automatic companion rule.[13] Several District courts have rejected the rule, too.[14] All of these decision have been rendered since the 1979 *Ybarra* decision. When asked to adopt the "automatic companion rule," the Sixth Circuit said:

> We decline to adopt an "automatic companion" rule, as we have serious reser-

vations about the constitutionality of such a result under existing precedent. Review of *Berryhill, Poms,* and *Simmons* suggests that the language in those cases which the Government views as legitimizing a *Terry* frisk of any companion of an arrestee is in each case *dictum* unnecessary to the court's holding.[15]

In some of the cases rejecting the rule, the courts, nevertheless, found there were other circumstances which made the pat-down of the companion within constitutional bounds.

To this Court's knowledge, neither the Third Circuit nor the District Court for Delaware have opined on or decided a case involving the automatic companion rule. Nor, as the Eighth Circuit candidly acknowledged, has the United States Supreme Court directly addressed the relationship of *Terry v. Ohio*[16] to the automatic companion rule.[17] It would be too presumptuous, therefore, for a State trial court to predict what the United State Supreme Court would do when confronted with a case where it had to confront *Terry, Ybarra,* and the automatic companion rule. But this Court need not speculate in any event.[18]

### Delaware Constitution

The reason this Court need not speculate about the United States Supreme

---

11. *Id.* 444 U.S. at 93, 100 S.Ct. at 343, 62 L.Ed.2d at 246–247.

12. *U.S. v. Simmons,* 567 F.2d 314 (7th Cir. 1977); *U.S. v. Poms,* 484 F.2d 919 (4th Cir. 1973); *U.S. v. Del Toro,* 464 F.2d 520 (2nd Cir.1972).

13. *U.S. v. Cole,* 628 F.2d 897 (5th Cir.1980); *U.S. v. Bell,* 762 F.2d 495 (6th Cir.1985); *U.S. v. Flett,* 806 F.2d 823 (8th Cir.1986); see *Williams v. Kaufman County,* 352 F.3d 994 (5th Cir.2003).

14. *U.S. v. Starks,* 301 F.Supp.2d 76 (D.Mass. 2004); *U.S. v. Meadows,* 885 F.Supp. 1 (D.D.C.1995).

15. *U.S. v. Bell,* 762 F.2d at 498.

16. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

17. *U.S. v. Flett,* 806 F.2d at 826.

18. See discussion, however, infra. pp. 246–48.

Court would decide is that the Delaware Constitution would not allow for it. This Court recognizes that the Delaware Supreme Court in *Hunter v. State*[19] alluded to the automatic companion rule. According to the Supreme Court, this Court utilized the rule to uphold the pat-down of Hunter who was a companion of a target arrestee. The Supreme Court said it did not have to use the rule, however, to uphold the search of Hunter.[20] There was a separate warrant for Hunter, he was a known companion of the target, the two were seen doing something suspicious, and Hunter made some furtive moves before being seized and patted-down. Thus, the State's reliance on *Hunter* is misplaced.

In *State v. Fitzpatrick*,[21] this Court said the Delaware Supreme Court cited with approval the automatic companion rule in *Hovington v. State*.[22] The Court in *Fitzpatrick* believed the rule had been adopted, and therefore, was bound to follow it. A close examination of *Hovington*, however, shows that the rule has not been adopted in Delaware.

First, the *Hovington* opinion contains no explicit adoption language. Second, to the extent there is a reference to the rule, it is contained in a footnote:

> In *Downs*, when the driver of an automobile was arrested for a narcotics violation, albeit without a warrant, this Court held that the occupants of that automobile were properly subjected to an "investigatory stop." *Downs v. State*, 570 A.2d at 1144; *U.S. v. Berryhill*, 445 F.2d 1189, 1193 (9th Cir.1971)(all companions of arrestee within immediate vicinity, capable of accomplishing a harmful assault upon officers, are subject to "pat-down" reasonably necessary to assure they are unarmed).[23]

The third reason to question whether *Hovington*, in fact, adopted, explicitly or implicitly, the companion rule, are the facts of Hovington's seizure and subsequent search. As is the case with Henderson, Hovington was not the target. The police had arrest warrants obtained by the DEA for two others. The warrants were based on drug sales in a secluded and known drug sales area near Ellendale. The police went to that same area to arrest the two targets. As they approached a vehicle in which those two persons and Hovington were located, they and Hovington ran. When he got out of the car an officer observed some objects in Hovington's hands. During the chase, the police momentarily lost sight of Hovington but when he reappeared, he no longer had anything in his hands. Hovington was forced to the ground at gun point.

The *Hovington* court did not utilize the automatic companion rule to uphold his search and subsequent seizure of things on his person. Instead the court said:

> When the officers arrived to execute the arrest warrants, Hovington and the subjects of those warrants (Haugabook and Augustin) all fled. Hovington's flight in response to a showing of lawful authority, in the context of the background facts known to the officers, supplied a reasonable basis for pursuing Hovington for the purpose of conducting an investigative stop. The officers were operating in a potentially dangerous secluded area, already known to them for its narcotics trade. Hovington may have been fleeing to destroy evidence or

---

**19.** 783 A.2d 558 (Del.2001).

**20.** *Id.* at 561.

**21.** 1994 WL 380992 (Del.Super.).

**22.** 616 A.2d 829 (Del.Supr.1992).

**23.** *Id.* at 832.

to obtain weapons. By pursuing Hovington as he fled from the scene, the officers acted properly in exercising "unquestioned command of the situation" in order to minimize the risk of harm to themselves and all persons who were present.[24]

It is important to note, however, that in reaching that result, the *Hovington* court relied upon this passage from *Michigan v. Summers*:

> [B]oth the law enforcement interest and the nature of the "articulable facts" supporting the detention are relevant. Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found. Less obvious, but sometimes of greater importance, is the interest of minimizing the risk of harm to the officers.... [T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.[25]

The full passage from which that was taken says:

> In assessing the justification for the decision of an occupant of premises being searched for contraband pursuant to a valid warrant, both the law enforcement interest and the nature of the "articulable facts" supporting the detention are relevant. Most obvious is the legitimate law enforcement interest in preventing flight in the event hat incrimination evidence is found. Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of

harm to the officers. Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation. Finally, the orderly completion of the search may be facilitated if the occupants of the premises are present. Their self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand.

It is also appropriate to consider the nature of the articulable and individualized suspicion on which the police base the detention of the occupant of a home subject to a search warrant. We have already noted that the detention represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant. The existence of a search warrant, however, also provides an objective justification for the detention. A judicial officer has determined that police have probably cause to believe that someone in the home is committing a crime. Thus a neutral magistrate rather than an officer in the field has made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of a home. The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal

---

**24.** *Id.* at 832.

**25.** 452 U.S. 692, 702–703, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340, 349–350 (1981).

activity justifies a detention of that occupant.[26]

But there are other points instructive in *Summers* including:

These cases recognize that some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity. In these cases, as in *Dunaway [v. State of New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)], the Court was applying the ultimate standard of reasonableness embodied in the Fourth Amendment (footnotes omitted).[27]

The holding in *Michigan v. Summers* states:

That holding [*Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)] is relevant today. If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home. Thus, for Fourth Amendment purposes, we hold that a warrant to search of for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted (footnotes omitted).[28]

There was only one person seized in *Summers.* He was the occupant of the house being searched. There were no companions of any sort. In short, while the language from *Summers* cited in *Hovington* provides some policy basis for the automatic companion rule, neither the facts nor the holding in *Summers* implicate it.

*Hovington* also cited with apparent approval as a basis for validating Hovington's seizure and the subsequent search, the case of *Maryland v. Buie.*[29] In that case, the police entered Buie's house with an arrest warrant (no search warrant) for him. The police went throughout Buie's house. One officer shouted down the cellar steps to which Buie answered. He came upstairs and was arrested. To insure no one else was there, one of the officers went down to the basement to check. While there, in plain view, he saw unique clothing matching the description of clothing worn during the robbery for which Buie was being arrested. In *Buie,* too, there were no companions in the house.

The issue, as the United States Supreme Court stated it was:

The issue in this case is what level of justification the Fourth Amendment required before Detective Frolich could legally enter the basement to see of someone else was there.[30]

Interestingly for this case and others, the Court said:

**26.** *Id.* at 702–04, 101 S.Ct. at 2594–95, 69 L.Ed.2d at 349–50.

**27.** *Id.* at 699–700, 101 S.Ct. at 2592–93, 69 L.Ed.2d at 348.

**28.** *Id.* at 704–05, 101 S.Ct. at 2595, 69 L.Ed.2d at 351.

**29.** 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

**30.** *Id.* at 330, 110 S.Ct. at 1096, 108 L.Ed.2d at 283.

The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter.

* * * *

Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's "turf." An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.[31]

The Court's holding stated:

The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene. We therefore vacate the judgment below and remand this case to the Court of Appeals of Maryland for further proceedings not inconsistent with this opinion.[32]

Again, the facts in *Buie* do not in any way implicate the automatic companion rule.

In upholding the police seizure in *Hovington*, the court also cited *Downs v. State*,[33] as precedent for the police action in *Hovington*. *Downs* has a lot of factual similarity to *Hovington*. The police did not have an arrest warrant. They went to an area near Smyrna in response to a series of tips about drugs being in and sold out of a specifically identified car. The last call which prompted the police to act also mentioned the "occupants" had a police radio scanner. There were several occupants in the car when the police arrived. The occupants were asked to get out. The driver did and was arrested. The passenger, Downs, asked why. When told, he was asked to get out; he then did. Downs, instead of putting his hands on the car, fled. He carried a blue bag with him. The bag and Downs were caught. It contained drugs. The Supreme Court said that the various anonymous calls to the police gave them "reasonable articulable suspicion of criminal activity on the part of the occupants of the car." [34]

Again, the companion rule was not needed in *Downs* to uphold the police action nor was it mentioned. *Downs* could not be used as authority here, because, except for being Jones' companion, there is indisputably no reasonable articulable suspicion of criminal activity involving Henderson.

As noted above, the State in support of its argument in this case cited and relies upon *Hovington*.[35] The Supreme Court in *Hovington* referred to several United States Supreme Court cases which this Court has just reviewed.[36] There have been, however, related additional United States Supreme Court decisions since those cited in *Hovington*. They are also of some pertinence to this case. The first is *Maryland v. Wilson*.[37] In that case, the police stopped a speeding car on I–95. The car had no regular tag. After stopping the car, the officer noticed there were two passengers both of whom kept looking at

31. *Id.* at 333, 110 S.Ct. at 1098, 108 L.Ed.2d at 285.

32. *Id.* at 337, 110 S.Ct. at 1099–1100, 108 L.Ed.2d at 288.

33. 570 A.2d 1142 (Del.1990).

34. *Id.* at 1146.

35. *Supra* p. 238.

36. *Supra* pp. 239–41.

37. 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997).

him and looking down. The driver got out and was trembling and appeared nervous. The officer noted, too, that Wilson, the front seat passenger, was sweating and appeared very nervous. The officer ordered Wilson out of the car. When he did, a quantity of cocaine fell off his lap to the ground. Wilson was arrested.

In a prior opinion, *Pennsylvania v. Mimms* (which is the other subsequently decided case),[38] the Supreme Court held the police had a right to order the driver to get out of the car lawfully stopped for a traffic violation. There was no suspicion of criminal activity other than the traffic violation. Once out, however, the officer saw a bulge, suspected a gun, and patted down the driver. A gun was found.

In *Maryland v. Wilson*, the issue was whether the rule in *Mimms* extended to allow the police to order the passengers to get out of a lawfully stopped car. The Court so held. In so holding the Supreme Court said:

> We must therefore now decide whether the rule of *Mimms* applies to passengers as well as to drivers. On the public interest side of the balance, the same weighty interest in officer safety is present regardless of whether the occupant of the stopped car is a driver or passenger. Regrettably, traffic stops may be dangerous encounters. In 1994 alone, there were 5,762 officer assaults and 11 officers killed during traffic pursuits and stops. In the case of passengers, the danger of the officer's standing in the path of oncoming traffic would not be present except in the case of a passenger in the left rear seat, but the fact that there is more than one occupant of the

vehicle increases the possible sources of harm to the officer.

> On the personal liberty side of the balance, the case for the passengers is in one sense stronger than that for the driver. There is probable cause to believe that the driver has committed a minor vehicular offense, but there is no such reason to stop or detain the passengers. But as a practical matter, the passengers are already stopped by virtue of the stop of the vehicle. The only change in their circumstances which will result from ordering them out of the car is that they will be outside of, rather than inside of, the stopped car. Outside the car, the passengers will be denied access to any possible weapon that might be concealed in the interior of the passenger compartment. It would seem that the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver (footnotes omitted).[39]

The Supreme Court referred back to *Michigan v. Summers*[40] and to that portion on officer safety also quoted in *Hovington*. It is important to note, however, that the narrow issue in *Maryland v. Wilson* was whether the officer had constitutional authority to direct the passenger to get out. Once that was affirmatively determined, it was unnecessary to go further because probable cause or reasonable articulable suspicion clearly then occurred.

---

**38.** 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).

**39.** 519 U.S. at 413–414, 117 S.Ct. at 885–886, 137 L.Ed.2d at 47–48.

**40.** *Supra* p. 239–40.

As he exited the car, the cocaine in his lap fell to the ground in plain view of the officer. In a sense, therefore, up until he got out of the car and this occurred, the passenger was a mere companion of the driver. Henderson, of course, never got beyond the status of a mere companion, and, he Henderson was to be the driver.

This Court's reference to *Mimms* and *Maryland v. Wilson* is done for two reasons. One, they add to the complex mosaic of the generally applicable case law in this area. Two, especially with *Maryland v. Wilson,* it underscores the folly of predicting what the United States Supreme Court would do in a factual setting such as this where the companions are outside of a car and merely companions not doing anything suspicious.

■ But the Court must return to an analysis under Article I, § 6 of the Delaware Constitution. The Delaware Supreme Court in *Jones v. State* ruled that this provision provides in some instances, greater protection than does the United States Constitution.[41] What is key in *Jones* is that ruling was made in the context of what constitutes a seizure under the Delaware Constitution versus the United State Constitution. The Delaware Supreme Court specifically declined to follow United State Supreme Court precedent in defining seizure. In adopting a stricter definition of reasonable articulable suspicion justifying a seizure, it held:

In our view, the question presented by Jones of when a seizure has occurred under Article I, § 6 of the Delaware Constitution requires focusing upon the police officer's actions to determine when a reasonable person would have believed he or she was not free to ignore the police presence. Under that analy-

sis, Jones was seized within the meaning of Section 1902 and Article I, § 6 when Patrolman Eschevarria first ordered him to stop and remove his hands from his pockets. If that seizure was not based upon reasonable and articulable suspicion, anything recovered as a result of that seizure is inadmissible at trial. We conclude that Jones' actions in walking away from Patrolman Eschevarria and his refusal to obey or submit to the officer's commands to stop and remove his hands from his pockets did not furnish grounds for reasonable and articulable suspicion to effect the seizure (footnotes omitted).[42]

It later held also that there was no reasonable articulable suspicion in that case.[43] The Court also said:

The second and third bases enumerated by the Superior Court (that the events took place at night in a high crime area/high drug area) do not depend on the 911 complaint. In *Brown v. Texas,* [443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)] the United States Supreme Court held that a defendant's presence in a high crime area, by itself will not establish reasonable suspicion. In our opinion, the fact that a defendant's presence in such a neighborhood took place at ten o'clock at night does not suggest a result different from that reached in *Brown.* Courts generally use factors such as nighttime and the negative reputation of a neighborhood as additional support to bolster a finding of reasonable suspicion, not as the sole bases on that finding. *Reasonable and articulable suspicion cannot be based on a defendant's presence in a particular neighborhood at a particular*

41. 745 A.2d at 863 (Del.1999).

42. *Id.* at 869.

43. *Id.* at 870, 871.

*time of day with no independent evidence that the defendant has committed, is committing or is about to commit a crime.* It is reasonable to assume that the framers of our constitutional protections against unreasonable searches and seizures were aware that law-abiding citizens who found themselves inadvertently in similar circumstances during colonial times were challenged by British soldiers (citations omitted) (emphasis added).[44]

The language from *Jones* to which this Court added emphasis strongly suggests that when confronted with rejecting or accepting the "automatic companion rule," the Delaware Supreme Court will reject it.

*Jones* must also be read in context with *Dorsey v. State*.[45] In *Dorsey*, the Supreme Court determined the search warrant which had been issued lacked probable cause. When it did so, it went on to reject the "good faith exception" to the exclusionary rule adopted by the United States Supreme Court in *United State v. Leon*.[46] Without repeating here the historical analysis in *Dorsey*,[47] and in *Jones*, the Delaware Supreme Court again said Article I, § 6 of the Delaware Constitution afforded greater protection than that found in the United States Constitution. It said there was no room in the Delaware Constitution for an exception to the requirement of probable cause to obtain a search warrant.[48]

Despite *Jones* and *Dorsey*, *Ybarra v. Illinois* and the automatic companion rule are not strangers to Delaware jurisprudence. In the 1981 case of *State v. Deputy*,[49] the Supreme Court said this:

We review the circumstances of Deputy's detention. The police were investigating a truly heinous crime. Detective Calloway, one of the first officers at the murder scene, testified that it appeared to him that more than one murderer may have been involved, due to "[t]he nature of the crime, how severe it was and the multiple stab wounds that each victim had." Consequently, when he and Detective Porter went to arrest Flamer, they were under the impression that not only were they looking for a brutal killer, but also that another killer, or several, might be at large as well.

They found Flamer, who was subject to arrest for the murders, on a roadside walking with Deputy and a third male. Thus Deputy was Flamer's immediate company hours after the crime had been discovered. "[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." Nor does it give rise to probable cause to arrest that person. But one's company with a suspected felon soon after the offense is undeniably a factor to consider when determining reasonable suspicion. A person, may, in some circumstances, be judged by the company he keeps. It undoubtedly entered into the arresting officers' minds as they found Deputy with Flamer. Moreover, the officers were understandably concerned for their own safety. They properly frisked all three men. When asked his name, Deputy replied, "Ray Anderson", in what Detective Porter described as an "eva-

44. *Id.* at 871.

45. 761 A.2d 807 (Del.2000).

46. 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

47. *See* Appendix.

48. 761 A.2d at 821.

49. 433 A.2d 1040 (Del.1981).

sive" manner. When asked where he was from, Deputy replied, "Harrington". Harrington is Porter's home town. Porter testified that he had lived in Harrington all his life, that he knew most of the people in Harrington by name or by sight, and that he was not satisfied with Deputy's answers. At this point Porter decided to take Deputy to Troop 5 for further questioning. We believe there was reasonable cause to suspect that Deputy had committed a felony. The police were looking for one or more killers. They had probable cause and a warrant for Flamer. They found Deputy in Flamer's immediate company shortly thereafter. When questioned, Deputy responded in what a trained detective with over six years' police experience termed an evasive manner. (Indeed it was later determined that that detective was right since Deputy in fact lied.) We conclude that these circumstances, when considered as a whole in a the context of that day, amounted to reasonable cause to suspect Deputy had committed a felony.[50]

■ Several observations readily occur. First, Deputy was a companion of a person to be arrested. However, there is a layer of facts in *Deputy* not found here. It is that the murder was recent, the police suspected more than one person had been involved, and Deputy gave an answer in an evasive manner when asked his name. None of that is present here.

In short, the sole basis for seizing Henderson was that he was Jones' companion. The issue is whether the "aura" of Jones as a person to be arrested as a drug dealer under the circumstances of when and where it all occurred validates the police action.

But there was no search warrant involved in this case. The only warrant was the one to arrest Jones not Henderson. There was no reasonable articulable suspicion about Henderson, the location, the time of day, or anything. There was no capias or warrant for him. In short, again, he was accompanying Jones across the parking lot of a Boys and Girls Club in broad daylight. Further, none of the three stopped and frisked had gotten into a vehicle and, obviously this was not a vehicle stop.[51] While the courts have recognized that it is not unusual for drug dealers and guns to be together,[52] this is the context of the drug dealer's person or residence or his vehicle. That recognition, at least in Delaware, has not extended to mere companions.

It might seem that based on *Berryhill* and *Maryland v. Wilson* that there is a chance the United States Supreme Court could adopt the "automatic companion rule," but the same cannot be said about the Delaware Supreme Court. That statement is based on its holdings and *dicta* in *Dorsey* and *Jones*.

---

50. *Id.* at 1043–1044.

51. In *Ingram v. State*, Del.Supr., No. 617, 2003, 2004 WL 2154325, Steele, C.J. (2004) (ORDER), the Supreme Court said at p. 5:

> On observing a motor vehicle violation, police officers may stop the car and order both driver and passenger out of the vehicle (*Maryland v. Wilson*, 519 U.S. 408, 412–14[, 117 S.Ct. 882, 137 L.Ed.2d 41] (1997)). Moreover, officers are permitted to conduct a pat-down search of all occupants for safe-

ty reasons (*Terry v. Ohio*, 392 U.S. 1[, 88 S.Ct. 1868, 20 L.Ed.2d 889] (1968)).

This language suggests, despite *Dorsey* and *Jones* that there has been an implicit adoption of the "automatic companion rule." The citation to *Maryland v. Wilson* indicates an overlapping or parallel interpretation of the search and seizure provisions in the federal and state constitutions.

52. *Backus v. State*, 845 A.2d 515, 518 (Del. 2004).

Reading *Dorsey* the likelihood of rejection arises because the Supreme Court declined to adopt the good faith exception. The "automatic companion rule" is arguably a similar kind of exception and one which, unlike the one for good faith, has not been explicitly adopted by the United States Supreme Court. In reading *Jones,* the likelihood of rejection arises because of the stricter quantum of evidence needed to meet the Delaware standard of reasonable articulable suspicion. Both decisions are founded in Article I, § 6. There was no probable cause to arrest Henderson and no reasonable articulable suspicion to seize and search him. On that basis the defendant's motion must be granted.

### Conclusion

For the reasons stated herein, the motion to suppress of defendant Steven Henderson is **GRANTED.**

**IT IS SO ORDERED.**

### APPENDIX

When the Delaware Supreme Court in *Dorsey v. State* declined to adopt the good-faith exception recognized in *United State v. Leon,* it premised that rejection on the requirement it found in the Delaware Constitution. That requirement was for probable cause to support a search warrant. Without probable cause, the warrant could not be valid. The consequence of a search warrant lacking probable cause was that the items seized pursuant to the warrant were excluded.[53]

The court in *Dorsey* relied upon an earlier Supreme Court decision to employ the exclusionary rule. That case was *Rickards v. State.*[54] *Rickards,* decided in 1950, is the first Delaware case adopting the exclusionary rule. Prior to 1950, the rule in Delaware had been the long-standing common law, from this country's and State's inception, that evidence illegally obtained was, nevertheless, *not* excluded.[55] In fact, two cases prior to *Rickards* had upheld the admissibility of illegally obtained evidence.[56]

Of course, in *Boyd v. United States,*[57] the United States Supreme Court adopted the exclusionary rule for the federal courts. Until *Mapp v. Ohio* in 1961,[58] the exclusionary rule was not made applicable to the states.

Therefore, the judicial creation of the exclusionary rule was in derogation of the common law existing when Delaware was a colony and when it and the other colonies became independent. It did not exist in Delaware jurisprudence when Delaware adopted its early constitutions. It was adopted as a rule only 54 years ago and under the 1897 Constitution and not under any of the three prior constitutions containing the same language or the Declaration of Rights and Fundamental Rules of the Delaware State. The 1897 constitution existed when *Chuchola* and *Episcopo* were decided, the two cases allowing illegally obtained evidence to be admitted. The good-faith exception to the exclusionary rule did not exist in the late 18th century

**53.** *Dorsey v. State,* 761 A.2d at 821.

**54.** 77 A.2d 199 (Del.1950).

**55.** *Id.* at 204.

**56.** *State v. Chuchola,* 120 A. 212 (Del.Gen. Sess.1922), and *State v. Episcopo,* 184 A. 872 (Del.Gen.Sess.1936).

**57.** 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

**58.** 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

jurisprudence because the exclusionary rule did not either.

In *Dorsey*, the Supreme Court said the Delaware Constitution mandates probable cause for a search warrant. It is important to note that the same prerequisite for probable cause exists for the power to arrest under Article I, § 6.[59] Yet the Delaware courts have recognized and approved the concept that a person can be seized and be subjected to a pat-down search where there is no probable cause but only reasonable articulable suspicion.[60] These decisions and legions of them since were constitutionally premised on *Terry v. Ohio*.[61] In *Terry*, the United States Supreme Court corrected the mislabeling of "detention and frisk" and labeled for what it is, seizure and search.[62] It sustained what has since become more widely and colloquially labeled again, as a stop and frisk, on the basis of such an action in the right circumstances not being an unreasonable search and seizure.

To endorse it in Delaware, the Supreme Court likewise had to find that such an action was not an unreasonable seizure even though lacking in probable cause for an arrest.

In short, the automatic companion rule is of recent creation (1971). The exclusionary rule as applicable under the Delaware Constitution is of relatively recent creation (1950). The "good-faith excep-

tion" to the exclusionary rule is of recent creation (1984). While the Delaware exclusionary rule did not exist through several iterations of Delaware constitutions, including its current one, one questions why the "automatic company rule" should *robotically* be rejected based on pre–1950 statutes, common law or other historical analysis. The rule is a corollary to *Terry v. Ohio*, which is already well-established law in Delaware.

Consideration of whether to recognize it or reject it as a matter of Delaware constitutional law must be based on its merits or lack thereof free of artificial shackles. This Court sees strongly competing policies with that analysis. One is clearly officer safety and the other is why should someone in Henderson's position be subjected to the procedure and have any evidence seized be admissible.

Among the historical points made in *Dorsey* for rejecting the good faith exception to the exclusionary rule, the Supreme Court discussed Delaware's special statute[63] regarding nighttime search warrants.[64] That discussion referred back to the discussion in *Mason v. State*.[65] In *Mason*, the Supreme Court noted the *statutory* basis for the extra requirements placed on the police and courts to obtain and issue a search warrant to be executed in the nighttime.[66] The *Mason* court acknowledged that there was probable cause to search Mason's home in the day time.[67]

---

**59.** *State v. Moore*, 187 A.2d 807, 810–811 (Del.Super.1963).

**60.** *Aaron v. State*, 275 A.2d 791 (Del.1971); *Modesto v. State*, 258 A.2d 287 (Del.Super. 1969).

**61.** 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**62.** 392 U.S. at 19, 88 S.Ct. at 1879, 20 L.Ed.2d at 904–05.

**63.** 11 *Del. C.* § 2308.

**64.** *Dorsey*, 761 A.2d at 807.

**65.** 534 A.2d 242 (Del.1987).

**66.** *Id.* at 254–255.

**67.** *Id.* at 254.

But the extra nighttime statutory requirements were not met. The court also noted the extra requirements for the execution of a nighttime search warrant had existed since 1852.[68] Curiously and ironically, until 1950, evidence seized pursuant to an improperly issued nighttime search would still have been admissible. Therefore, for nearly 100 years of various enactments of this special statute, it was either the common law rule of non-exclusion or arguably an implicit good faith exclusion still allowing such evidence to be admitted.

There is, however, *relevant* statutory history for the issues in this case. As noted above, the probable cause requirement for arrest, be it with or without a warrant, has existed in Delaware constitutions since the beginning. Nevertheless, prior to *Terry v. Ohio*, the Delaware legislature authorized the detention of citizens for two hours under these circumstances.

A peace officer may stop any person abroad whom he has reasonable ground to suspect is committing, has committed or is about to commit a crime, and may demand of him his name, address, and business abroad and whither he is going.[69]

This provision was enacted in 1951, including a minor amendment made in 1967, and is currently 11 *Del. C.* § 1902.[70] It has received much judicial attention over the years.[71] The Supreme Court in *State v. Deputy* clarified the expression "reasonable ground" as not being the equivalent of reasonable basis needed to arrest some-

one, i.e., probable cause. It is as *Deputy* notes, "a lesser standard."[72]

In effect 17 years before *Terry v. Ohio* was decided, Delaware, statutorily authorized the *seizure* of persons abroad, albeit for only two hours, on a *statutory* standard less than probable cause for arrest and despite the probable cause requirement of Article I, § 6. The two concepts, detention without probable cause and arrest requiring probable cause are not necessarily inconsistent, but they have been part of Delaware jurisprudence for about the same of time as the exclusionary rule, 54 years. Of course, to detain, the exact requirements of (now) § 1902 have to be met. They were not met in this case. Or, short of an arrest, the requirements of *Terry* and *Jones* of a reasonable articulable suspicion have to be met. Again, Delaware recognizes the lawfulness of a seizure when the police lack sufficient information for probable cause to arrest. It has done so despite the supposed more rigid requirements of Article I, § 6.

This long established statutory and case law history in the area of detention, therefore, underscores the need for flexibility of the proper analytical approach to the role of the automatic companion rule in Delaware jurisprudence.

---

68.   *Id.* at 248, footnote 15.

69.   48 Del. Laws Ch. 304.

70.   56 Del. Laws Ch. 152.

71.   *See State v. Deputy,* 433 A.2d at 1042–43 (Del.1981).

72.   *Id.* at 1042.