# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| v. | ) | ID No. 2310001233 |
| | ) | |
| STEPHEN HECK, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Date Submitted: September 6, 2024
Date Decided: October 17, 2024

*Upon Consideration of Defendant's Motion to Suppress*: **DENIED**

## MEMORANDUM OPINION

John W. Downs, Esquire, Brianna M. Mills, Esquire, Deputy Attorneys General, Wilmington, Delaware 19801. Attorneys for the State.

Eugene J. Maurer, Jr. Esquire, Molly R. Dugan, Esquire, Wilmington, Delaware. Attorneys for Defendant.

**JURDEN, P.J.**

# I.    INTRODUCTION

Defendant Stephen Heck, charged with Murder in the First Degree,[1] has filed a Motion to Suppress challenging the evidence gathered from five separate search warrants for lack of probable cause.[2]  Heck challenges (1) the evidence seized from his residence, (2) the tire impressions from his vehicle, (3) the information extracted from his physical cellphone, (4) the Cell Site Location Information ("CSLI") obtained through Verizon, and (5) the search of his body. [3]

# II.    BACKGROUND

*Monday, September 25, 2023*

## A.    Cynthia Amalfitano is Reported Missing

Detective Cevallos of the New Castle County Police Department ("NCCPD") arrived at Amalfitano's residence in response to a missing person report.[4]  The "reporting person" ("RP1") informed Detective Cevallos that Amalfitano had not gone to work and had not contacted anyone to report that she was going to be absent.[5] RP1 informed Detective Cevallos that they initially contacted Amalfitano's daughter, who asked her aunt ("W1") to attempt to reach Amalfitano at her residence.[6]  RP1 reported that W1 arrived at Amalfitano's residence at 10:15 a.m.

---

[1] D.I. 4.
[2] *See* Mot. to Suppress.
[3] *Id.*
[4] *See* Mot. to Suppress, Exhibit A ¶ 2 ("Exhibit A").
[5] *Id.*
[6] *Id.* ¶ 3.

and knocked on the rear door.[7]  W1 observed Amalfitano's two dogs, cell phone, purse, and keys inside the residence, and the rear door was unlocked.[8]  W1 immediately contacted the police.[9]

## B.    Detective Cevallos Speaks with W1

After his discussion with RP1, Detective Cevallos spoke with W1.[10]  W1 reported she last spoke to Amalfitano around 3:15 p.m. on Saturday, September 23, 2023.[11]  During that conversation, Amalfitano told W1 she was going to her beach house in Rehoboth, Delaware later that afternoon with her boyfriend, Heck, and would return on the evening of September 24, 2023.[12]  W1 told Detective Cevallos that Amalfitano was "very predictable" and "sticks to her routine.[13]  W1 also stated that it was "extremely unlikely" for her to miss work without telling anyone, or to go anywhere without taking her personal belongings, especially her dogs, and locking the door.[14]  According to W1, Amalfitano and Heck had been together for years, and over the course of their relationship there had been numerous domestic abuse incidents.[15]  In the most recent domestic abuse incident, Heck pushed

---

[7] *Id.* ¶ 4.
[8] *Id.*
[9] *Id.*
[10] *Id.* ¶ 6.
[11] *Id.*
[12] *Id.*
[13] *Id.* ¶ 7.
[14] *Id.*
[15] *Id.* ¶ 8.

Amalfitano, and Amalfitano kicked him of her residence because she feared for her life.[16] W1 advised Detective Cevallos that Heck and Amalfitano had broken up as recently as a couple weeks ago.[17] W1 also mentioned another domestic abuse incident that occurred in New Jersey, where Amalfitano was the victim and Heck was arrested.[18] Detective Cevallos obtained and reviewed a police report from Long Beach, New Jersey dated August 22, 2022, which confirmed W1's account of the New Jersey incident.[19] According to the New Jersey police report, Amalfitano reported that Heck grabbed her hand during an altercation and threatened to burn her on an electric stove.[20] W1 informed Detective Cevallos that Heck owned a gray 2024 Subaru Crosstrek, which was the vehicle they would have taken to the beach.[21] After speaking with W1, Detective Haines joined Detective Cevallos in his investigation and both officers contacted other family members and neighbors, who corroborated Heck's physical and verbal abuse of Amalfitano.[22]

---

[16] *Id.* Amalfitano left her residence after this incident and spent the night with a friend.
[17] *Id*.
[18] *Id.* ¶ 9.
[19] *Id.*
[20] *Id*. ¶ 9. Cynthia further reported that the following morning she tried to leave and told Heck she was going shopping to get away from him for some time. In turn, Heck told Amalfitano, "I cannot even tell you what will happen if you call the police."
[21] *Id.* ¶ 12. Detective Cevallos confirmed Heck was the registered owner of a gray 2024 Subaru Crosstreck with a Delaware license plate through a DELJIS inquiry.
[22] *Id.* ¶ 10.

## C. NCCPD Contacts Heck

The police went to Heck's residence and made contact with Heck.[23]  Heck was uncooperative and told them he was not going to answer any questions about Amalfitano without consulting with an attorney.[24]

## D. The NCCPD Accesses Surveillance Footage of the Area Surrounding Amalfitano's Beach House

Detective Sergeant Garcia and Detective Watson went to Amalfitano's beach house located in Rehoboth Beach.[25]  They were able to gain entry into the beach house and access its surveillance cameras.[26]  The surveillance footage depicts a person "visually consistent with" Amalfitano placing items into the back of Heck's vehicle at approximately 7:21 p.m. on Sunday, September 24, 2023.[27]  Heck's vehicle is then seen backing out of the beach house driveway at 7:25 p.m. with two people in the front seats.[28]

## E. The NCCPD Accesses Surveillance Footage of the Area Surrounding Amalfitano's Residence

The surveillance footage obtained by the police of the area around Amalfitano's residence shows what appears to be Heck arriving in his vehicle, alone,

---

[23] *Id.* ¶ 13.
[24] *Id.*
[25] *Id.* ¶ 14.
[26] *Id.*
[27] *Id.*
[28] *Id.*

at the rear of Amalfitano's residence at 10:54 p.m. on September 24, 2023.[29]  Heck enters the rear of Amalfitano's residence and exits with a trash bag.[30]  He then gets into his vehicle around 11:24 p.m., leaves her residence, and returns six minutes later.[31]  Heck is then seen entering and exiting Amalfitano's residence numerous times carrying different bags.[32]  On several occasions, Heck appears to be removing items from his vehicle and putting them into the dumpster.[33]  At 11:45 p.m., Heck again enters Amalfitano's residence, this time carrying what appears to be a purse.[34] At 11:56 p.m., Heck is seen walking from his vehicle to the dumpster and then entering Amalfitano's residence.[35]  Heck is not seen again on the surveillance footage until approximately 7:40 a.m. on September 25, 2023, when he is observed exiting Amalfitano's residence carrying several bags.[36]  Heck then enters and exits Amalfitano's residence several times, carrying numerous bags and what appears to be clothing.[37] At 7:59 a.m., Heck carries a black bag to his vehicle and then takes a similar black bag to the dumpster.[38]  Immediately thereafter, Heck leaves

---

[29] *Id.* ¶ 16.
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.*

Amalfitano's residence.[39]  The surveillance footage does not show Amalfitano returning to her residence at any point.[40]

## F.    The NCCPD Obtains Amalfitano's CSLI Data

As part of the NCCPD's investigation, Detective Watson obtained Amalfitano's CSLI data for September 24, 2023, which enabled him to create a digital timeline of Amalfitano's cell phone activity for that day.[41]  Amalfitano did not make any outgoing calls or messages on September 24, 2023.[42]  The last activity on her phone shows she took pictures in the area of Rehoboth Beach around 11:45 a.m. on September 24, 2023.[43]  Detective Watson created a digital timeline of Amalfitano's cell phone traveling from the area of Rehoboth back to her residence based on her cell phone's contact with various cell phone towers.[44]  Amalfitano's route home appeared to be direct, and Detective Watson observed that her cell phone made contact with two separate cell phone towers around 9:11 p.m. that evening, both of which were in close proximity to Amalfitano's residence.[45] Amalfitano's cell phone connected to her home Wi-Fi at approximately 11:46 p.m. on September 24, 2023, even though Heck was the only person seen returning to Amalfitano's

---

[39] *Id.*
[40] *Id.* ¶ 17.
[41] *Id.* ¶ 19.
[42] *Id.* ¶ 15.
[43] *Id.*
[44] *Id.* ¶ 19.
[45] *Id.*

residence.[46]  Based on Detective Watson's timeline, Amalfitano's and Heck's whereabouts are unknown for an hour and forty-three minutes.[47]

*Tuesday, September 26, 2023*

### G.    The NCCPD Pinpoints Location of Interest and Finds Amalfitano's Body

Based on Amalfitano's CSLI data, Detective Watson pinpointed Carousel Park as a location of interest.[48]  The NCCPD went to Skyline Drive at the entrance of Carousel Park to conduct a terrain search.[49]  Officers discovered Amalfitano's body in the wood line.[50]  Upon examination of Amalfitano's body, "officers and medical staff noted bruising of the neck and arms, back injuries, lacerations to the head, and petechia"—injuries consistent with physical assault.[51]  It appeared from the crime scene that a struggle occurred between Amalfitano and her assailant.[52]

---

[46] *Id.* ¶¶ 15, 17.

[47] *Id.* ¶ 19.

[48] *Id.* ¶ 20.

[49] *Id.* ¶ 21.

[50] *Id.*

[51] *Id.* ¶ 22.

[52] *Id.* (Detectives deduced a struggle occurred because when Amalfitano's body was found, she was missing jewelry, her clothes were disheveled, there were drag marks in the ground surrounding her body, and blood was also located on the ground.).

## F. The Search Warrants

For ease of reference and to avoid confusion, the Court lists the challenged warrants below:

1. On September 26, 2023, a search warrant for Heck's Residence was issued ("**Residence Warrant**").[53]

2. On September 26, 2023, a search warrant for Heck's vehicle was issued ("**Vehicle Warrant**").[54]

3. On September 27, 2023, a search warrant for the digital contents of Heck's cell phone was issued ("**Cell Phone Warrant**").[55]

4. On September 29, 2023, a search warrant was issued authorizing Verizon to provide detectives with Heck's call detail records and CSLI ("**CSLI Warrant**").[56]

5. On April 24, 2023, a search warrant for Heck's "body" was issued ("**Body Warrant**").[57]

---

[53] *See* Exhibit A.
[54] *See* Mot. to Suppress Exhibit B ("Exhibit B").
[55] *See* Mot. to Suppress Exhibit E ("Exhibit E").
[56] *See* Mot. to Suppress Exhibit F ("Exhibit F").
[57] *See* Mot. to Suppress Exhibit D ("Exhibit D").

### III. STANDARD OF REVIEW

Both the United States and Delaware Constitutions provide that a search warrant may be issued only upon a showing of probable cause.[58] To establish probable cause, "a nexus [must appear] between the items . . . sought and [the] place to be searched."[59] The "test for probable cause [in support of a search warrant] is much less rigorous than that governing the admission of evidence at trial and requires only a probability, not a *prima facie* showing, of criminal activity be established."[60] A valid search warrant must be particular, specifically identifying "the place to be searched, and the persons or things to be seized."[61] "The particularity requirement prevents the issuance of general warrants that may be overly intrusive and not narrowly tailored enough to their justifications."[62]

"It is well-settled that the Court must employ 'a four-corners' test to determine whether an application for a warrant demonstrates probable cause."[63] Under the

---

[58] *See* U.S. Const. amd. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."); Del. Const. art. I, § 6 ("The people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or thing, shall issue without describing them as particularly as may be; nor then, unless there be probable cause supported by oath or affirmation.").

[59] *State v. Chaffier*, 2023 WL 1872284, at *3 (Del. Super. Jan. 17, 2023) (citing *Hooks v. State*, 416 A.2d 189, 203 (Del. 1980)).

[60] *State v. Sisson*, 883 A.2d 868, 876 (Del. Super. 2005) (citing *Jensen v. State,* 482 A.2d 105, 112 (Del. 1984)).

[61] *Chaffier*, 2023 WL 192284 at *3 (citing *Wheeler v. State*, 135 A.2d 282, 295-96 (Del. 2016)).

[62] *Id.* at 299.

[63] *Sisson*, 883 A.2d at 876.

four-corners test, a reviewing court must discern whether the supporting affidavit "set[s] forth sufficient facts on its face for a judicial officer to form a reasonable belief that an offense has been committed and that seizable property would be found in a particular place."[64] The judicial officer who makes the initial finding of probable cause is owed great deference, and such a finding will not be "invalidated by a hypertechnical, rather than a common sense, interpretation" of a supporting affidavit.[65] "When considering the sufficiency of the application for a search warrant, the reviewing court must view the application 'as a whole and not on the basis of its separate allegations.'"[66] "Thus, a magistrate may find probable cause when, considering the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"[67]

## IV.    DISCUSSION

### A.    The Search of Heck's Residence

#### 1.    Constitutional and Statutory Protections

Under Article I Section 6 of the Delaware Constitution, "[t]he people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures."[68] While the Fourth Amendment to the United States Constitution

---

[64] *Id*. (citing *Pierson v. State,* 338 A.2d 571, 573 (Del.1975)).
[65] *Id*.
[66] *Id*. (citing *Gardner v. State,* 567 A.2d 404, 409 (Del.1989) (quoting *Jensen,* 482 A.2d at 111)).
[67] *Sisson v State*, 903 A.2d 288, 296 (Del. 2006) (citing *Stones v. State*, 1996 WL 14557, at * 2 (Del. 1996) (ORDER) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).
[68] Del. Const. art. I, § 6.

contains similar language: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated,"[69] the Delaware Supreme Court has rejected the notion that the two constitutional provisions "mean exactly the same thing."[70] Rather, "Delaware's independent interest in protecting its citizens against unreasonable searches and seizures did not diminish after the adoption of the Fourth Amendment to the federal Constitution,"[71] and thus, the Delaware Constitution offers broader protections than the federal corollary.[72]

As mentioned above, both the United States and Delaware Constitutions provide that a search warrant may be issued only upon a showing of probable cause.[73] "Probable cause is established when a nexus between the items to be sought and the place to be searched appears."[74] The Delaware constitutional requirements for search warrants are codified in 11 *Del.C.* §§ 2306 and 2307.[75] Section 2306 provides that an application for a search warrant must "state that the complainant suspects that such persons or things are concealed in the house, place, conveyance

---

[69] U.S. Const. amend. IV.

[70] *Juliano v. State*, 254 A.3d 369, 377 (Del. 2020) (internal citation and quotations omitted).

[71] *Mason v. State*, 534 A.2d 242, 248 (Del. 1987).

[72] *Jones v. State*, 745 A.2d 856, 866 (Del. 1999). It therefore follows that if the police conduct is afforded an exception to the warrant requirement under the Delaware Constitution, then it also does so under the Fourth Amendment.

[73] *See* U.S. Const. amd. IV; Del. Const. art. I, § 6.

[74] *Hooks v. State*, 416 A.2d 189, 203 (Del. 1980).

[75] *Sisson*, 883 A.2d at 875.

or person designated [in the search warrant application] and shall recite the facts upon which suspicion is founded."[76] Section 2307(a) provides that "the warrant shall designate the house, place, conveyance or person to be searched, and shall describe the things or persons sought as particularly as possible."[77] "On a motion to suppress challenging the validity of a search warrant, the defendant bears the burden of establishing that the challenged search or seizure was unlawful."[78]

### 2. *The Residence Warrant*

Detective Cevallos obtained the search warrant for Heck's residence on Tuesday, September 26, 2023, the day Amalfitano's body was found.[79] The Residence Warrant sought,

> [L]atent fingerprint processing and DNA swabs, trace evidence to include but not limited to, hairs and fibers, bodily fluids, a reddish-brown substance visually consistent with blood, any and all clothing or items that may have a reddish-brown substance visually consistent with blood or bodily fluids on them . . . any and all debris consistent with dirt, gravel or vegetation, any dark colored lenses consistent with COACH eye ware, any and all rings, any and all documentation of the motive, planning, commission, flight, or conspiracy related to Murder 1st.[80]

The Affidavit of Probable Cause ("Affidavit") supporting the Residence Warrant contains twenty-nine paragraphs. It details (1) Heck and Amalfitano's relationship,

---

[76] *Id.*

[77] *Wheeler*, 135 A.2d at 295 (citing 11 *Del.C.* § 2307(a)).

[78] *Sisson*, 883 A.2d at 875.

[79] Exhibit A ¶ 21.

[80] *Id.*

(2) the events surrounding Amalfitano's disappearance, (3) Heck's behavior the evening Amalfitano went missing and the days thereafter, (4) the manner and environment in which Amalfitano was murdered, and (5) why evidence of the crime is likely to be found in Heck's residence.[81] The Affidavit asserts that because Amalfitano was found in an area containing "fruit-bearing vegetation" and "a struggle may have taken place," it is probable that Amalfitano's assailant would have evidence of the crime on their person or clothing that could then transfer to their residence or vehicle.[82]

### 3. Parties' Contentions

Relying on *Dorsey v. State*,[83] Heck argues that the Affidavit supporting the Residence Warrant lacks probable cause because it was issued based on the sole inference that Heck was a suspect in Amalfitano's murder,[84] and the mere inference that someone is a suspect does not equate to probable cause to search that person's home.[85] In support of his argument, Heck states: (1) the only references to Heck's residence in the Residence Warrant are that NCCPD officers went to Heck's residence to inquire about Amalfitano's whereabouts,[86] Heck's residence and

---

[81] *Id.* ¶¶ 6-24.
[82] *Id.* ¶ 23.
[83] *See Dorsey v. State*, 761 A.2d 807 (Del. 2000).
[84] Mot. to Suppress ¶¶ 6-7.
[85] *Id.* ¶ 10.
[86] *Id.* ¶ 8.

Carousel Park are approximately 20 miles apart,[87] and Amalfitano's CSLI showed she traveled a direct route from Rehoboth to her residence without stopping;[88] and (2) paragraphs 25 to 28 of the Affidavit fail to link evidence of Amalfitano's murder to Heck's residence because the averments use the verbiage "may" or "can be."[89]

In response, the State notes that the Affidavit "establishe[s] that the items being sought at [Heck's residence] *might* be present, since [Heck] *could* have taken them there, or be found in transference[90], or establish a motive leading to the death of Amalfitano."[91]  In the alternative, the State argues that because the police were already aware of Heck's New Jersey domestic violence arrest (based on what W1 told Detective Cevallos), under the inevitable discovery doctrine, the police would have discovered Heck's court documents relating to that incident.[92]

### 4.    *Analysis*

Heck argues that based on the Delaware Supreme Court's holding in *Dorsey*, the evidence obtained pursuant to the Residence Warrant should be suppressed.[93]  In *Dorsey*, the defendant discovered a tenant deceased in his building and called the

---

[87] *Id.*

[88] *Id.* ¶ 9 (quoting Exhibit A ¶ 19).

[89] *Id.* ¶ 10.

[90] *See id.* ¶ 23. The Affidavit avers that Amalfitano's body was found in area with "a substantial amount of fruit bearing vegetation," and it is likely that vegetation or stains therefrom would be transferred from the scene to the suspect, his vehicle, or his residence.

[91] D.I. 19 ¶ 25 (emphasis added).

[92] *Id.* at ¶ 26.

[93] The only evidence ultimately seized from Heck's residence was eleven photographs of the court documents relating to his case in New Jersey.

police to report the incident.[94] After the defendant refused to consent to a warrantless search of his vehicles, the police applied for a warrant based on the fact defendant's vehicles were "close in proximity to the crime scene."[95] The defendant moved to suppress the evidence for lack of probable cause, but the Superior Court denied his motion.[96] On appeal, the Delaware Supreme Court reversed the Superior Court's decision, finding that the inferences made by the Superior Court were not based on the affidavit, but were based instead on the Court's own prior inference that police suspected the defendant of the murder.[97] In *Dorsey*, the sole connection between the defendant's vehicle and the crime was that the vehicle was parked on a street near the residence where the victim's body was found.[98] The Supreme Court in *Dorsey* held "the four corners of the affidavit [did] not comport with § 2306's requirements that the complaint 'recite the facts' why the items sought would be found in Dorsey's vehicle."[99]

*Dorsey* is instructive here. The Affidavit in support of the Residence Warrant provided the magistrate with speculation as to what *could* be found at Heck's

---

[94] *Dorsey*, 761 A.2d at 809.
[95] *Id.*
[96] *Id.* at 810 (The Superior Court held "although the affidavit does not specifically state facts to support a belief that the gun used in the shooting or bloody items of clothing would be found in Dorsey's vehicle, it is reasonable to infer probable cause, given the nature of the crime and the items sought by Police.").
[97] *Id.* at 813.
[98] *See Dorsey*, 761 A.2d at 809, 812.
[99] *Id.* at 812.

residence. The Affidavit states that at approximately 7:59 a.m. on September 25, 2023, Heck "carrie[d] a black bag [from Amalfitano's residence] to *his vehicle*"[100] and "[i]t is unknown exactly when Heck's belongings would have been moved from [Amalfitano's residence], but on 9/24/23, surveillance video shows items being removed and place[d] in a *dumpster* and his *vehicle*."[101] The Affidavit frequently mentions Heck's *vehicle*, but does not set forth sufficient facts on its face for the Court to form a reasonable belief that evidence of Amalfitano's murder would be found in Heck's *residence*.

Absent a nexus, the Affidavit lacks probable cause for a search of Heck's residence, and the search was therefore unconstitutional.[102] The Court now turns to the State's alternative argument regarding the inevitable discovery doctrine.

a. Inevitable Discovery Doctrine

*i. Introduction*

Under the inevitable discovery doctrine, evidence will not be excluded if "the evidence found because of a Fourth Amendment violation would inevitably be

---

[100] Exhibit A ¶ 16 (emphasis added).
[101] *Id.* ¶ 18 (emphasis added).
[102] *See Chaffier*, 2023 WL 1872284 at *3 (citing *Hooks v. State*, 416 A.2d 189, 203 (Del. 1980) (For a search warrant to be valid, "a nexus [must appear] between the items…sought and [the] place to be searched.").

discovered through lawful means in the absence of the illegality . . . ."[103]  In *Cook v. State*, the Delaware Supreme Court explained:

> The majority of the cases employing the inevitable discovery exception involve instances in which the illegal police conduct occurred while an investigation was already in progress and resulted in the discovery of evidence that would have eventually been obtained through routine police investigatory procedure. The illegalities in such cases, therefore, had the effect of simply accelerating the discovery. In general, where the prosecution can show that the standard prevailing investigatory procedure of the law enforcement agency involved would have led to the discovery of the questioned evidence, the exception will be applied to prevent its suppression.[104]

"Invocation of the [inevitable discovery] exception is particularly appropriate when routine police investigatory procedures are in progress and the challenged behavior merely accelerates discovery of the evidence."[105]  Illegally obtained evidence is admissible if it "would have been discovered through legitimate means or absence of official conduct."[106]  The State bears the burden of demonstrating by a preponderance of the evidence that there was "an untainted investigative chain that

---

[103] *Garnett v. State*, 308 A.3d 625, 634-35 (Del. 2023) (herein "*Garnett III*") (citing *Cook v. State*, 374 A.2d 264, 267-68 (Del. 1977)).  The Supreme Court in *Garnett III*, cited to the two underlying Superior Court cases as *Garnett I* and *Garnett II*.  *Id.*

[104] *Cook*, 374 A.2d at 268.

[105] *State v. Preston*, 2016 WL 5903002, at *4 (Del. Super. Sept. 27, 2016).

[106] *Roy v. State*, 62 A.3d 1183, 1189 (Del. 2012).

can be established that would have inevitably led the police to obtain a warrant."[107]

"Whether evidence would have been discovered is a question of fact."[108]

### ii. Analysis

During the search of Heck's residence, investigators discovered and photographed paperwork concerning the New Jersey domestic violence incident between Heck and Amalfitano.[109] The State claims this evidence would have been inevitably discovered because the police were already researching prior "incidents of criminal conduct" between Heck and Amalfitano before they sought the search warrant for Heck's residence.[110] The police also knew from W1 that Heck was arrested in New Jersey for domestic violence against Amalfitano.[111] At the Suppression Hearing, Detective Cevallos testified that after Amalfitano's family told him Amalfitano and Heck had an "on-and-off relationship" with a history of "physical and verbal violence," an officer from his department reached out to the Long Beach Police Department to learn more.[112] The Long Beach Police Department provided Detective Cevallos' department with a police report from the

---

[107] *State v. Bradley*, 2011 WL 1459177, at *14 (Del. Super. Apr. 13, 2011); *see also Nix v. Williams*, 467 U.S. 431, 432 (1984) ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means—here the volunteers' search—then the deterrence rationale has so little basis that the evidence should be received.").

[108] *Garnett III*, 308 A.3d at 650.

[109] D.I. 19 ¶ 26, see also Tr. of Suppression Hr'g 121:14-16.

[110] *Id*.; *see also* Exhibit A ¶ 9.

[111] *Id*.

[112] Tr. of Suppression Hr'g 108-09.

domestic violence incident that occurred between Amalfitano and Heck on August 22, 2022.[113] Detective Cevallos reviewed this report prior to applying for the Residence Warrant and searching Heck's residence on September 26, 2023.[114] While the New Jersey police report Detective Cevallos reviewed was not identical to the documents seized from Heck's residence, Detective Cevallos testified that, as the chief investigating officer on the case, he would have followed up on the police report and discovered the outcome of that court proceeding.[115]

In *State v. Holmes*, the Court highlighted the distinction between speculation and certainty under the inevitable discovery doctrine.[116] In *Holmes*, the defendant moved to suppress all evidence seized as a result of an alleged unlawful search and seizure following a traffic stop that coincided with an independent undercover drug investigation.[117] At the suppression hearing, a detective's testimony established that it was uncertain as to whether an arrest that day would have occurred, or whether his month-long undercover investigation would have continued.[118] Based on the detective's testimony, the Court was "not persuaded that the incriminating evidence would have been discovered through legitimate means in the absence of official

---

[113] Tr. of Suppression Hr'g 109:1-3.
[114] Tr. of Suppression Hr'g 110:9-11.
[115] Tr. of Suppression Hr'g 118:12-14. Detective Cevallos also stated he was aware Heck was on probation as a result of the incident.
[116] *See generally State v. Holmes*, 2015 WL 5168374 (Del. Super. Sept. 3, 2015).
[117] *Id*. at *1.
[118] *Id*. at *10.

misconduct."[119]  Holding that "speculation does not establish inevitability," the Court granted the defendant's motion to suppress.[120]

The facts here are quite different.  In Heck's case, Detective Cevallos testified that, as chief investigating officer, he "*would* have followed up" on the police report regarding Heck's domestic violence incident in New Jersey.[121]  Detective Cevallos' testimony differs from the speculative testimony in *Holmes* where the detective vaguely spoke to what *could* have happened.[122]  The court documents photographed at Heck's residence contained information Detective Cevallos was already aware of, and he testified his investigation would not have stopped at simply obtaining and reviewing the police reports.[123]  Accordingly, the State has met its burden in proving that the court documents would have been inevitably discovered through lawful means in the absence of illegality.  The inevitable discovery doctrine applies, and the eleven photographs of court documents obtained during the illegal search of Heck's residence will not be suppressed.  The Motion to Suppress the evidence obtained pursuant to the Residence Warrant is **DENIED**.

---

[119] *Id.* at *9.
[120] *Id.* at *10.
[121] Tr. of Suppression Hr'g 118:12-14.
[122] *Holmes*, 2015 WL 5168374 at *9.
[123] Tr. of Suppression Hr'g 110:4-11, 118:12-14.

**B.    Heck's Tire Impressions**

Heck argues that because the Vehicle Warrant expired October 6, 2023 and the NCCPD did not take the tire impressions until October 12, 2023, the tire impressions must be excluded as fruits of a warrantless search.[124]    The State represented during the Hearing that it will not seek to introduce Heck's tire impressions at trial.[125]    Consequently, the Motion to Suppress Heck's Tire Impressions is **MOOT**.

**C.    The Search of Heck's Body**

Heck contends that the Body Warrant lacked probable cause.[126]  The State represented in its Response and during the Hearing that it will not introduce evidence obtained from the search of Heck's body in its case-in-chief.[127]  Consequently, this motion is **MOOT**.

**D.    Heck's Cell Phone Evidence**

Detective Ruiz testified at the Suppression Hearing that the Cell Phone Warrant pertains to information taken directly from Heck's phone using a data extraction program called Cellebrite,[128] whereas the CSLI Warrant pertains to CSLI data investigators received from Verizon, Heck's cell phone provider.[129]

---

[124] Mot. to Suppress ¶¶ 13-14.
[125] *See* Tr. of Suppression Hr'g 35:22–23, 36:1; 49:18-23.
[126] *See* Mot. to Suppress ¶¶ 16-19; *see also* Tr. of Suppression Hr'g 49:8-13.
[127] D.I. 19 ¶ 30.
[128] Tr. of Suppression Hr'g 76:13-22.
[129] Tr. of Suppression Hr'g 85:5-17.

## 1. The Cell Phone Warrant

The Cell Phone Warrant seeks data extracted from Heck's physical cell phone. Heck objects to the Cell Phone Warrant claiming there was not a "sufficient nexus between [Amalfitano's] death and [Heck's] cell phone," and the cell phone extraction contained data outside the September 24 to September 26, 2023 timeframe cited in the warrant.[130]

The State informed the Court and Defense Counsel at the Hearing that the data it intends to use at trial comes from the CSLI Warrant, and represented it would not introduce any evidence obtained from the Cell Phone Warrant at trial.[131] Consequently, the Motion to Suppress the Cell Phone Warrant is **MOOT**.

## 2. The CSLI Warrant

Detective Cevallos obtained the search warrant for Heck's Verizon CSLI on September 29, 2023.[132] The CSLI Warrant sought the following information related to Heck's cell phone:

> [H]istorical call detail records, local and long-distance telephone connection records, date and time of the communication, method of communication, source and destination of communications sent or received (collectively "Call Detail Records") with cell site location information, to include corresponding

---

[130] Mot. to Suppress ¶¶ 23-24; *see also* Tr. of Suppression Hr'g. at 59:8-23; 60:1-17 (Detective Ruiz testified that the "other" dates in the report were an unintended consequence of the Cellebrite application used to extract information from Heck's cellphone. Detective Ruiz also testified that the reason other dates appear, even though he sets a temporal limitation, is because on September 26, 2023, the cell phone connected to a Bluetooth device, and information was pulled from that Bluetooth device inadvertently.).

[131] *Id.*

[132] *See* Exhibit F.

cell tower information, cell tower face information, and sector information, through which communications were sent and received and/or to which the telephone connected (collectively "Cell Site Location Information" or "CSLI"), that is in electronic storage in an electric communications system or remote computing service for the period of September 23, 2023 [at] 1921 hours (EST) through September 26, 2023 at 0845 hours (EST).[133]

The Affidavit supporting the CSLI Warrant was a detailed 50-paragaraph document, which included the recitation of events discussed in the Residence Warrant.[134] The Affidavit sets forth the following notable facts: (1) the last activity apparent on Amalfitano's digital timeline is a picture from Rehoboth Beach around 11:45 a.m. on September 24, 2023,[135] (2) Heck and Amalfitano are seen leaving her beach house at 7:25 p.m. on September 24, 2023,[136] (3) only Heck is seen returning to Amalfitano's residence around 10:54 p.m. on September 24, 2023,[137] and (4) Amalfitano's cell phone connected to her home Wi-Fi that evening, but she was not seen on her residence's surveillance footage.[138] Based on Amalfitano's exigent CSLI data, it appears that her cell phone made contact with two towers around 9:11 p.m. on September 24, 2023, which were close to her residence.[139] Heck is not seen on surveillance footage at Amalfitano's residence until 10:54 p.m.. The NCCPD

---

[133] *Id.*
[134] *Id.*
[135] *Id.* ¶ 21.
[136] *Id.* ¶ 20.
[137] *Id.* ¶ 22.
[138] *Id.* ¶ 21.
[139] *Id.* ¶ 26.

was unable to determine Amalfitano's and Heck's whereabouts between 9:11 p.m. and 10:54 p.m.[140]

a. Parties' Contentions

Heck argues the CSLI data obtained through the CSLI Warrant should be suppressed because "the blanket assumption that all individuals in modern day carry a smartphone with location-tracking capabilities coupled with a suspicion that an individual was involved in criminal activity does not equate to probable cause."[141] Further, Heck argues the application for Heck's CSLI data was a court order rather than a search warrant, the "Delaware Stored Communications Act is not a back-alley opportunity to obtain CSLI when [the State's] investigation falls short of probable cause,"[142] and the State's extraction of Heck's CSLI constitutes a warrantless search.[143]

In its response, the State contends "the four corners of the search warrant establish a compelling reason to obtain the [CSLI] from [Heck's] cell phone provider."[144] The State points to the facts included in the Affidavit to support its position[145] and states the purpose of the CSLI Warrant was to compare Heck and

---

[140] *Id.*
[141] *Id.* ¶ 23.
[142] *Id.* ¶ 27 (mistyped as ¶ 24).
[143] *Id.*
[144] D.I. 19 ¶ 32.
[145] *Id.* ¶ 22.

Amalfitano's CSLI data jointly to determine if the two devices were in the same location throughout the evening of September 24, 2023.[146]

b. Analysis

In *Carpenter v. United States*, the United States Supreme Court addressed the question of "whether the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements."[147] Given its "deeply revealing" and "retrospective" nature, the Supreme Court held that an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through historical cell phone location information and, therefore, Government acquisition of CSLI records constitutes a search within the meaning of the Fourth Amendment.[148] Accordingly, to be constitutional, the search must satisfy the probable cause requirement of the Fourth Amendment.[149] Again, the Court engages in the four-corners analysis.

In his Affidavit, Detective Cevallos states that "[o]btaining cellular timing advance location information for [Heck] on the date and time surrounding [Amalfitano's murder] *will* assist investigators in connecting him to the crime or, in

---

[146] *See Id.* ¶ 33.
[147] *State v. Waters*, 2019 WL 2486753, at *2 (Del. Super. June 13, 2019) (citing *Carpenter v. United States*, 585 U.S. 296, 298 (2018)).
[148] *Id.*
[149] *Id.*

the alternative, establishing a forensic alibi for him."[150] Using Heck's CSLI data would enable investigators to compare his whereabouts with those of Amalfitano and determine the likelihood that he participated in her murder. By reciting the facts upon which suspicion is founded and describing the thing sought with particularity, the Affidavit for the CSLI Warrant satisfies the requirements set forth in 11 *Del.C.* § 2306 and § 2307. In viewing the Affidavit in totality, there is probable cause to believe that evidence of Amalfitano's murder would be found in Heck's CSLI data. Accordingly, the Court finds the CSLI Warrant is lawful and need not address Heck's argument regarding the Delaware Stored Communications Act.[151] The evidence obtained pursuant to the CSLI Warrant will not be suppressed.

## V. CONCLUSION

1. Motion to Suppress the Residence Warrant. Under the four-corners test, the Residence Warrant fails to demonstrate probable cause. The supporting affidavit fails to set forth sufficient facts on its face for a judicial officer to form a reasonable belief that the seizable property would be found in Heck's residence. That said, because the State has met its burden of proving by a preponderance of the evidence that routine police investigatory procedures were already underway and the challenged behavior merely accelerated the discovery of the evidence, the inevitable

---

[150] Exhibit F ¶ 5 (emphasis added).
[151] *See* Mot. to Supp. ¶ 27 (mistyped as ¶ 24).

discovery doctrine applies and the Motion to Suppress the Residence Warrant is therefore **DENIED**.[152]

2.     Motion to Suppress Heck's Tire Impressions. The State will not seek to introduce the tire impressions at trial and therefore this motion is **MOOT**.

3.     Motion to Suppress the Search of Heck's Body. The State will not seek to introduce evidence obtained from the search of Heck's body in its case-in-chief and therefore this motion is **MOOT**.

4.     Heck's Motion to Suppress Cell Phone Evidence. The State will not seek to introduce any evidence obtained pursuant to the cell phone warrant at trial and therefore this motion is **MOOT**.

5.     Motion to Suppress the CSLI Warrant. The Court finds probable cause within the four corners of the Affidavit supporting the CSLI Warrant, and therefore the Motion to Suppress the CSLI Warrant is **DENIED**.

     **IT IS SO ORDERED**.


                                   /s/ Jan R. Jurden
                               Jan R. Jurden, President Judge

Original to Prothonotary

---

[152] *See Preston*, 2016 WL 5903002 at *4.